UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
PALM BEACH DIVISION

No. 9:17-cv-81237-Rosenberg/Reinhart

ADT LLC & ADT US HOLDINGS, INC.,

      Plaintiffs,

          v.                                   **JURY TRIAL DEMANDED**

ALDER HOLDINGS, LLC, ALARM
PROTECTION MANAGEMENT LLC, ALARM
PROTECTION ALABAMA LLC, ALARM
PROTECTION CALIFORNIA LLC, ALARM
PROTECTION FLORIDA LLC, ALARM
PROTECTION GEORGIA LLC, ALARM
PROTECTION MISSISSIPPI LLC, ALARM
PROTECTION TENNESSEE LLC, ALARM
PROTECTION TEXAS LLC, ALARM
PROTECTION ALASKA LLC, ALARM
PROTECTION ARKANSAS LLC, ALARM
PROTECTION KENTUCKY LLC, ALARM
PROTECTION OKLAHOMA LLC, ALARM
PROTECTION TECHNOLOGY LLC,
RHODESIAN PROTECTION LLC, BOERBOEL
PROTECTION LLC, ALDER PROTECTION
HOLDINGS LLC, & ADAM D. SCHANZ,

      Defendants.

_____/

**SECOND AMENDED COMPLAINT**

Plaintiffs ADT LLC and ADT US HOLDINGS, INC. (together, "ADT"), through

undersigned counsel, bring this action for compensatory and punitive damages,

defendants' profits, contempt sanctions, and attorney fees against the defendants,

collectively doing business as "Alder," and in support allege:

## SUMMARY OF THE CASE

1.      This action follows *ADT LLC v. Alarm Protection LLC*, No. 9:15-cv-80073 ("*Alarm Protection*"), which the parties settled on May 24, 2017.   It seeks compensatory and punitive damages, an award of Alder's profits, contempt sanctions and attorney fees for Alder's ongoing efforts to defraud ADT's customers even after they agreed in *Alarm Protection* to stop their agents' practice of using false representations of ADT affiliation to confuse customers into believing that Alder agents represent ADT. Alder competes with ADT, selling residential alarm systems door-to-door to ADT's customers.  When Alder's sales agents confuse ADT's customers into believing that they are affiliated with ADT, Alder freerides on ADT's brand, reputation and goodwill with its customers, and wins their trust in a calculated effort to gain access to the customers' homes and install new Alder equipment in the guise of an "upgrade."  Once inside, the Alder agents sign ADT's customers to new five-year contracts with Alder.  These practices violate Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), as well as ADT's common-law rights against unfair competition.

2.      Each of the defendants except Alder Protection Holdings LLC was also a defendant in *Alarm Protection*.  The parties settled *Alarm Protection* on May 24.  The Court (Rosenberg, J.) entered an agreed permanent injunction ("Injunction") on October 20.  In the five months between the settlement and entry of the Injunction, over 200 ADT customers reported visits by Alder sales agents in which the Alder agents used representations of false affiliation to gain access to the customers' homes.  Since October, Alder's agents have continued to violate the injunction, even though door-to-door alarm companies like Alder typically curtail their sales programs in the winter months.

3.      These ongoing frauds on ADT's customers are flagrant violations of the Injunction.  ADT asks the Court to impose contempt sanctions to coerce defendants' compliance with the Injunction.  ADT also seeks the full measure of compensatory and punitive damages available to it for defendants' torts, and an award of attorney fees under the Injunction and Section 35 of the Lanham Act.

## PARTIES

4.      Plaintiff ADT US Holdings, Inc., is a Delaware corporation with its principal place of business at 1501 Yamato Road, Boca Raton, Florida 33431, and as such is a citizen and domiciliary of this District.  ADT US Holdings is a holding company that owns, *inter alia*, all ADT trademarks, including without limitation 21 ADT live word trademarks featuring the letters "A – D – T," registered in the United States Patent & Trademark Office that bear the registration numbers 3251836, 3352491, 710708, 710507, 3515266, 3511263, 3445423, 3909665, 3485321, 3421797, 1034716, 838956, 803247, 846966, 3348663, 3253804, 3445420, 3991449, 3335239, 3335298, and 3427081 ("ADT Trademarks").

5.      Plaintiff ADT LLC is a Delaware limited liability company with its principal place of business at 1501 Yamato Road, Boca Raton, Florida 33431.  ADT LLC is an operating company that runs the ADT alarm services business in the United States. ADT LLC uses the ADT Trademarks under license from ADT US Holdings.  ADT LLC is owned by ADT US Holdings, Inc., and is also a citizen and domiciliary of the District.

6.      Each of the limited liability company defendants except Alder Protection Holdings LLC ("LLC Defendants") is organized under the laws of the State of Utah. Each was organized and created by Adam Schanz, and each is ultimately owned by Mr.

Schanz, a Utah citizen and domiciliary.  As such, each of the LLC Defendants is a citizen and domiciliary of the State of Utah.  Each of the LLC Defendants maintains offices at 450 North 1500 West, Orem, Utah 84057.  Each has designated as its agent for service of process Corporation Service Company, 10 E. South Temple, Suite 850, Salt Lake City, Utah 84133.  Upon information and belief, each of these LLC Defendants adopted the trade name "Alder" in early 2015.

7.      Alder Holdings LLC, in particular, is a Utah limited liability operating company that, beginning in early 2015, sells, installs, and services alarm accounts. Beginning no later than January 2016, defendants claim to have conducted all business relating to the sale of alarm systems through Alder Holdings LLC.  Alder Holdings is registered as a foreign limited liability company in Florida with the Florida Department of State, Division of Corporations.  Alder Holdings has sales agents in Florida and holds business licenses to sell alarm systems in Florida.  From May 25, 2017, to October 2017, ADT received reports from nine customers of false sales pitches by Alder Holdings sales agents at their homes in Florida.

8.      Alder Protection Holdings LLC's Certificate of Formation was filed on December 16, 2016, with an effective date of January 1, 2017, under the laws of the State of Delaware.  Its designated agent for service of process is Corporation Service Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801. ADT is unaware of Alder Protection Holdings LLC's purpose among the LLC Defendants; on information and belief, it is their agent and alter ego.

9.      Defendant Adam Schanz is a citizen and domiciliary of the State of Utah. Mr. Schanz is the manager and the ultimate owner of each of the other defendants.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to section 1331 of title 28 because it presents a Federal question under Section 43 of the Lanham Act.

11.     This Court has supplemental jurisdiction over the state-law claims also asserted in this action pursuant to section 1367(a) of title 28.

12.     Venue lies in this District pursuant to section 1391(b) of title 28 because defendants reside or are otherwise found in this District, and because a substantial number of the events giving rise to the claims asserted in this Complaint occurred in this District.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

13.     ADT, founded in 1874, is the oldest, largest and best-known provider of electronic security services and equipment for homes and businesses in the United States.

14.     ADT provides security services and equipment nationwide and is engaged in interstate commerce for the purposes of the Lanham Act.

15.     ADT's name and trademarks are registered with the United States Patent and Trademark Office.

16.     Alder is a direct competitor of ADT in the market for residential electronic security systems.  ADT and Alder market and sell substantially similar goods made by the same suppliers through the same channels to the same target markets of residential consumers.  The companies also provide substantially similar security monitoring services to their respective customers.  ADT operates in each of the states in which defendants sell alarm systems.

17.     ADT names the LLC Defendants other than Alder Holdings LLC as defendants because defendants have commingled their assets and Mr. Schanz has disregarded corporate formalities among the LLC Defendants, resulting in a formal structure of dozens of companies that lacks substance, in which various corporate assets appear to be held apart from what Alder now claims to be the current operating entities. ADT alleges their relationship to Mr. Schanz and Alder in the following paragraphs.

***"Alder's" evolution and structure***

18.     Defendant Adam Schanz first began to assemble what is now Alder in 2008 by filing articles of organization for Alarm Protection Technology LLC with the Utah Department of Commerce.  Mr. Schanz soon organized other Alarm Protection Technology companies and operated them from 2009 through 2013 under the trade name "APT" as part of his ongoing effort, which continues today, to sell alarm systems to ADT's customers by confusing them as to his companies' seeming (but false) affiliation with ADT.

19.     In early 2013, in response to a preliminary injunction entered by this Court that forbade the use of "APT," Mr. Schanz reorganized his alarm sales operation under the "Alarm Protection" name.  In early 2015, Mr. Schanz began using the trade name "Alder" for the various LLC Defendants.

20.     Mr. Schanz created defendant Rhodesian Protection, LLC, in 2013, to hold the membership interests of the Alarm Protection defendants.  Mr. Schanz served as the CEO, the only member, and the manager of Rhodesian Protection until April 2015. Through his ownership and control of Rhodesian Protection, Mr. Schanz maintained complete control over the Alarm Protection defendants.

21.     In April 2015, Mr. Schanz transferred his membership interest in Rhodesian Protection to defendant Alarm Protection Technology LLC.  This transfer did not affect Mr. Schanz's control over Rhodesian or the Alarm Protection defendants because Mr. Schanz also owns and manages Alarm Protection Technology LLC.  In fact, Mr. Schanz ultimately owns and controls each and every entity, and their predecessors and affiliates, that are mentioned in this Complaint.

22.     Mr. Schanz formed defendant Alder Holdings in January 2015 and is the manager of that entity.  Alder Holdings has one member, defendant Boerboel Protection, LLC, and Mr. Schanz is the sole member and manager of Boerboel.  As the manager of Alder Holdings, and as the owner and manager of Alder Holdings' sole member, Mr. Schanz has complete control over Alder Holdings.

23.     Since February 2015, Mr. Schanz has operated all of the LLC Defendants under the Alder trade name.  Starting in April 2015, the Alarm Protection defendants sold alarm accounts on behalf of Alder Holdings.  At some time between April and December 2015, Mr. Schanz claims to have moved the operations of each of the Alarm Protection defendants to Alder Holdings, and Alder Holdings started directly selling alarm accounts in the Alarm Protection defendants' respective states, using the Alarm Protection defendants' assets and sales agents.

24.     Mr. Schanz appears to have moved all of the Alarm Protection defendants' functions relating to the alarm sales business to Alder Holdings, including all functions relating to the Alarm Protection defendants' sales agents.  Those sales agents then became Alder agents, and sold alarms for Alder.  By January 1, 2016, Mr. Schanz

appears to have migrated the sales functions of his entire alarm business from the Alarm Protection defendants to Alder Holdings.

25.    Although Alder claims that the Alarm Protection defendants have stopped selling new alarm accounts as of January 1, 2016, they each appear to continue to own the alarm accounts that each previously generated.  The Alarm Protection defendants do not collect and disburse alarm account payments through their own bank accounts, or provide any services or support to the accounts they hold.  On information and belief, Alder funds the sales functions of Alder Holdings with the cash generated by the accounts held by the Alarm Protection defendants.

26.    Alder appears to provide all operational support to the Alarm Protection defendants, including *inter alia* providing them with alarm monitoring services, collecting alarm subscription payments, and providing customer service and repairs, for all of the alarm accounts owned by the Alarm Protection defendants.

27.    Far from creating a network of entities with distinct legal identities and functions, Mr. Schanz has at all times operated the Alarm Protection defendants as a single commingled enterprise.  Mr. Schanz created and operated this convoluted Alder corporate structure to mislead, and avoid any meaningful accountability to, state regulators and tort creditors. At all times material to this case, Mr. Schanz ignored the separate existences of the various Alarm Protection defendants, and operated them all as his agents and alter egos.

28.    As a result, none of the LLC Defendants had any separate existence apart from Mr. Schanz and the Alder enterprise he owns and controls. Each existed solely to generate sales for Mr. Schanz.  "Alarm Protection Florida," for example, never transacted

business for any entities other than Mr. Schanz and Alarm Protection LLC.  Alarm

Protection Florida never marketed the products or services of companies other than

Alarm Protection or Alder.  Alarm Protection Florida had no salaried employees.  Alarm

Protection Florida relied upon Alarm Protection LLC, and now Alder, for its

administrative and operational functions, and for its marketing, customer support, and

customer communications functions.  Alarm Protection Florida has no office in Florida.

Mr. Schanz operated each of the other Alarm Protection defendants in the same manner.

29.     Each of the Alarm Protection defendants is inadequately capitalized.  In

2016, their sales revenues were deposited into bank accounts owned or controlled by

Alarm Protection LLC.  Their commissions owed to sales agents were paid from those

same bank accounts.  Their own bank accounts were shams that never used to operate the

businesses.  Instead, they were opened with token $250 initial deposits, and each was

closed by the host bank once the bank's monthly service charges exhausted each account.

On information and belief, nearly all of the named defendants, including all of the Alarm

Protection defendants, lack any working capital of their own.

30.     Mr. Schanz kept cashflows and working bank accounts out of the reach of

the Alarm Protection defendants to insulate them against judgments from creditors who

might sue them.  Nor did any of the Alarm Protection defendants maintain any

meaningful presence in the states in which each was active, apart from bases to supply

and support their sales agents' efforts.  For example, Alarm Protection Florida rented an

apartment in Delray Beach to stock alarm equipment and supplies, but closed it once

Alarm Protection Florida stopped marketing Alarm Protection alarm systems to new

customers.  On information and belief, Mr. Schanz operated each of the other Alarm Protection defendants in the same manner.

31.     Mr. Schanz operated the Alarm Protection defendants in all other respects as mere instrumentalities.  Mr. Schanz deployed a sales force comprised entirely of "independent contractors" supposedly beyond Alarm Protection's control, to achieve Mr. Schanz's illegal purpose of acquiring new customers through the use of deceptive sales tactics in disregard of the Lanham Act and state law, without any legal consequence to Mr. Schanz.  To the extent they may be said to exist at all in practice, each of the Alarm Protection defendants has at all times acted in active concert with Mr. Schanz to confuse consumers in violation of the Lanham Act.

32.     Other courts, after reviewing the defendants' convoluted structures, undercapitalization, and disregard of corporate formalities, have found them to be alter egos created for the purpose of avoiding creditors and regulators.  In Alaska, a federal court entered judgment in 2017 jointly and severally against all of the Alder and Alarm Protection entities before it as alter egos for their violations of state and federal laws barring the use of unfair and deceptive trade practices in commerce in Alaska.

33.     Moreover, Mr. Schanz has a history of creating new companies when confronted with impending threats to his assets in the existing companies.  In December 2014, on the eve of trial in ADT's first lawsuit against Mr. Schanz and his companies, Mr. Schanz created "Alder Holdings, LLC," but at the trial of that cause testified that "Alder" was just a trade name.

34.     Similarly, while the *Alarm Protection* case was pending, as described above, Mr. Schanz transferred the Alarm Protection businesses into Alder Holdings, and

created and organized new entities, and reorganized the Alarm Protection assets among them all, with himself as each's manager and ultimate owner.  As a result, this Court permitted ADT to conduct discovery to uncover the new entities and to add them to the *Alarm Protection* complaint.  [*Alarm Protection* DE 128.]

35.    As *Alarm Protection* was heading to trial, Mr. Schanz organized yet another new company, this time in Delaware: "Alder Protection Holdings, LLC."  On information and belief, Mr. Schanz formed Alder Protection Holdings as part of his strategy of hiding his companies' sales activities and assets in entities beyond the reach of state regulators and tort creditors.   Defendants are the subject of numerous regulatory investigations by state attorneys general, and are engaged in ongoing civil litigation with competitors in, *inter alia*, this Court, in Utah, in Texas, and in Alaska.  These state investigations and civil actions all focus on the same deceptive sales practices that ADT has alleged in *Alarm Protection* and in this Complaint.  ADT here names "Alder Protection Holdings" as a defendant to each of the three counts of this Complaint in the belief that it is yet another of Mr. Schanz's alter egos, created to avoid and frustrate ADT and defendants' other judgment creditors.

36.    Prior to serving this Second Amended Complaint, in an effort to simplify the pleadings, ADT asked defendants to stipulate to the roles that each of the various defendants has occupied since May 2017, such as which entity owns existing customer accounts, which owns newly-created accounts, which sells to customers, which trains sales agents, which receives and disburses cash from customers, and so on.  Defendants declined to offer this information by stipulation.  Defendants' refusal to volunteer this information underscores ADT's concern that Mr. Schanz continues to use his

complicated conglomeration of limited-liability companies as alter egos for hiding

misconduct and assets from state attorneys general and tort creditors like ADT.

***Defendants' deceptive sales practices***

37.    Since 2012, defendants have persisted in selling alarm systems to ADT

customers by using false representations of affiliation that have confused ADT's

customers into believing that the defendants' sales agents somehow represented ADT and

were visiting to upgrade the customers' existing ADT alarm systems.

38.    Defendants targeted ADT customers by seeking houses with the

distinctive ADT sign that ADT's customers post on their premises to deter burglars and

trespassers.  Defendants' sales agents solicited those ADT customers in unannounced

"cold" sales visits to the customers' homes.

39.    Defendants' sales agents used false representations of ADT affiliation that

were intended to mislead (and that did mislead) ADT's customers into believing that

defendants represented ADT, or were affiliated with ADT, or with the companies (*e.g.*,

GE) that made the ADT alarm equipment installed in the customers' homes.  These false

pitches stated, *inter alia*, that defendants had bought ADT; that defendants had merged

with ADT; that ADT had contracted with defendants to service ADT's customers or to

upgrade their alarm equipment; that defendants were from the manufacturer of the

customers' alarm equipment, visiting at ADT's direction to upgrade the equipment; or

that ADT had gone out of business and defendants had been engaged to fulfill ADT's

obligations under the customers' ADT contracts.

40.    Defendants' agents used these pitches to induce ADT customers to believe

that they had an existing business relationship with the agents, to trust them, and to grant

the agents entry into their homes.  Once inside, having won the customers' trust by these frauds, the agents led the customers to sign Alarm Protection or Alder contracts and install defendants' alarm systems in the mistaken belief that they were receiving new ADT equipment as an "upgrade" of their ADT alarm system.

41.     Defendants' deceptive practices injured ADT by causing ADT's customers to listen to their deceptive sales pitches, and, ultimately, to uninstall their ADT alarm systems, replace them with defendants' equipment, terminate the customers' ADT contracts, and have the customers execute new contracts for security services with them.

42.     Defendants, by falsely representing to ADT customers that their ADT alarm systems are outdated and vulnerable to burglars, or are in need of "upgrades," and by impersonating ADT in their false sales pitches, damaged ADT's goodwill and reputation as a safe and reliable provider of security services.

43.     Defendants, by freeriding on ADT's trademark in its sales pitches, unjustly enriched itself at ADT's expense and deprived ADT of royalties that ADT dealers ordinarily pay ADT as a part of their dealership agreements to use the ADT name. As Alder expert witness Peter Gampel opined in *Alarm Protection*, "the application of a royalty rate in conjunction with an established royalty base is an accepted methodology."

44.     As a result of defendants' practices, a number of ADT customers confused defendants' sales agents with ADT representatives, and as a result unwittingly found themselves with defendants' alarm systems installed in their homes, and with contractual obligations to both defendants and ADT.  In some instances, ADT was required to send technicians to the deceived customers' houses to reinstall the removed ADT equipment. In others, the customers retained defendants' systems and cancelled their ADT contracts.

45.     Such practices violated statutory and common-law prohibitions against the use of false and deceptive statements in commerce.  They also violated the security systems industry's own Code of Ethics and Standards of Conduct, which requires that companies "truthfully and clearly identify themselves by name … at the initiation of a sales presentation, without request from the consumer," and which prohibits as common deceptive sales practices, *inter alia*, (a) any claim that a competitor is going out of business, (b) any claim that the company is taking over the competitor's accounts, or (c) any offer of an "update" or "upgrade" of an existing system that requires the execution of a contract with a new security services provider.

***The Alarm Protection lawsuit and settlement***

46.     ADT sued the defendants in 2015 in the *Alarm Protection* suit for an injunction to stop this misconduct and for damages to compensate ADT for its losses summarized in the preceding paragraphs.

47.     On May 24, 2017, the parties settled *Alarm Protection*.  The settlement included an agreed permanent injunction that bars defendants from engaging in a variety of practices that are likely to confuse customers as to the affiliation of defendants' sales agents.

48.     The Court entered the Injunction on October 20.  [*Alarm Protection* DE 431.]  As the Court has ruled, however, [DE 31] the Injunction applies to the parties as of May 24, when they agreed to be bound by it.

***Alder's post-settlement deceptive sales practices***

49.     *Immediately* upon the settlement, Alder redoubled its efforts to steal ADT customers by defrauding them with false claims of ADT affiliation.

50.     In the eight weeks following the settlement, ADT received 118 reports of Alder deceptive sales practices – an unprecedented rate of complaints in ADT's history of tracking its customers' deceptive sales reports.

51.     On August 28, ADT identified to Alder the 169 then-existing reports that ADT had received from customers of false representations of ADT affiliation by Alder sales agents, [*Alarm Protection* DE 424-2; *id*. DE 424-3] and provided Alder with ADT's records of the reports, including the call recordings of the customer complaints.

52.     Since May 24, ADT has received over two hundred new reports from its customers of Alder attempts that occurred between May 25 and October 19, many successful, to confuse ADT's customers with false representations of ADT affiliation.

53.     Nine of these reports came from ADT customers in Florida, reporting the use by Alder sales agents in Florida of false representations of ADT affiliation that were intended to confuse, and did confuse, ADT's customers into believing that the Alder agent somehow represented ADT.

54.     ADT continues to receive reports from its customers relating to deceptive sales practices by Alder sale agents in violation of the parties' settlement and agreed Injunction.  For the period January through March 2018, a dormant period for door-to-door alarm sales, ADT received 25 customer complaints about Alder sales practices – more than any other alarm services company during that period.

55.     Other sources confirm that Alder's use of false representations of ADT affiliation remained a routine practice after the May 24 settlement.  The Alder page on the Utah Better Business Bureau website contains dozens of reports by customers reporting Alder deceptive sales practices after May 2017.

56.     For example, a July 19, 2017, BBB report by "Steven T." states:

[Alder] practices deceptive sales practices. My mother is 86 years old. They came to her home claiming to be with ADT and were doing a medical upgrade to her existing ADT alarm system. Within a couple of hours they had replaced her ADT system with their own which is not what she thought they were doing. The sales person did not even leave his name or business card or anything. When I, her son, found out I told them she didn't understand what they were doing and to put things back the way they were. I was told she would receive a letter. Which took 2 weeks to arrive and it stated that in order to remove the system and cancel the monitoring fee, she would have to pay $2700.00. They seem to prey on the elderly so beware. My mom now has to pay ADT AND Alders monitoring fee. Other tricks by this particular sales man was illegible handwriting and no clear way to identify him. That alone demonstrates his intention to be deceptive.

57.     These reports are but the tip of the iceberg.  For each aggrieved customer who reports a deceptive sales practice, many more go unreported.  This Court has already recognized "the well-known and unremarkable proposition that customers who complain are vastly outnumbered by customers who do not complain." [*Alarm Protection* DE 379 at 15.]  Alder's own consumer behavior expert, Dr. Dan Sarel, testified in *Alarm Protection* that he has conducted consumer complaint studies and agrees that not all aggrieved customers complain.

58.     At all times material to this action, Alder's sales agents have tailored their sales pitches to confuse ADT's customers at the outset of their sales pitches in cold sales calls at the customers' doorsteps.  Alder's agents make false representations of affiliation with ADT to win the customers' interest and trust. ADT's customers allow Alder's agents into their homes in the mistaken belief that they are speaking with a person affiliated somehow with ADT, visiting to provide the customers with goods and services related to their existing ADT alarm system.  But for this confusion, ADT's customers would not allow Alder's sales agents into their homes or listen to what they had to say.

16

59.     The confusion caused by Alder's false representations of affiliation harms ADT by allowing Alder to freeride on ADT's goodwill with its customers to gain their attention and trust.  Alder's later efforts at the point of sale to "clarify" its agents' earlier frauds on consumers by having the customer declare her understanding that Alder lacks any ADT affiliation does not cure or excuse the confusion that Alder's frauds cause prior to the point of sale, even in those instances where a customer understands by the point of sale that she is contracting with Alder.  But in many instances the customer signs a contract with Alder in the mistaken belief that she is signing only a work authorization for the installation of ADT equipment by ADT or its affiliate.

## COUNT I
## CONTEMPT OF THE INJUNCTION

60.     Plaintiffs incorporate Paragraphs 1 through 59, as if set forth fully here.

61.     On February 2, 2018, ADT served an amended Notice of Alleged Violations ("Notice") upon defendants that stated over two hundred apparent violations of the Injunction.  The Notice was accompanied by a spreadsheet providing detailed accounts of each of the alleged violations.  ("Spreadsheet.")  ADT incorporates the Spreadsheet (Exhibit 1) by reference, as if set forth fully in the text of this Complaint.

62.      The parties completed the dispute resolution procedures stated in the Injunction but did not resolve ADT's claims.

63.     The incidents identified in the Spreadsheet violate numerous requirements set forth in Paragraphs 1 and 2 of the Injunction, as set forth in detail in the Spreadsheet, and are evidence that such conduct remains a routine practice of Alder notwithstanding the May 24 settlement and Injunction.

64.     As alleged in Paragraph 54 above, ADT continues to receive numerous reports from customers about defendants' violations of the Injunction.  On May 22, ADT served an amended Notice of Alleged Violations identified an additional fifty violations of the Injunction.  (Exhibit 2.)  ADT continues to collect the information required by the Injunction about the new violations as they occur, and will continue to engage defendants in the Injunction's dispute resolution process with respect to new violations as the case continues.   ADT seeks recovery under this Count based only on those violations that the parties are unable to resolve through that process before the trial of this cause.

65.     ADT has been damaged as a result of these violations.  The prohibited conduct confuses of the market for ADT's goods and services; disrupts ADT's relationships with its customers; causes ADT's customers to withhold trade from ADT; damages ADT's brand, goodwill and reputation as a reliable provider of security systems; enables Alder to avoid royalties for the use of ADT's word trademark in commerce; and unjustly enriches Alder at ADT's expense.

66.     Defendants, by their systemic and pervasive violations of the Injunction immediately upon its creation, acted with egregious intent to violate the Injunction. Defendants today continue to violate the Injunction's clear commands in states across the country.  Without sanctions to compel compliance, defendants will likely continue to disregard the Injunction and defraud ADT's customers with abandon.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against defendants, and award the following relief:

a.     Compensatory damages, in an amount to be found at the trial of this cause, but believed to be no less than $17,000,000;

b.      Such sanctions, in kind and amount, as the Court finds necessary to coerce defendants' compliance with the Injunction; and

c.      Such other and further relief as the Court may deem appropriate in the circumstances.

## COUNT II
## UNFAIR COMPETITION IN VIOLATION
## OF THE LANHAM ACT, 15 U.S.C. § 1125(a)(1)(A)

67.      Plaintiffs incorporate Paragraphs 1 through 59, as if set forth fully here.

68.      Alder, at Mr. Schanz's direction, trains its sales agents to misrepresent themselves to ADT customers as being affiliated somehow with ADT.  Alder and its agents use these false representations of affiliation to confuse ADT's customers as to the agents' true affiliation, to interest ADT's customers in their pitches, to win the customers' trust, and to gain access to their homes.

69.      In fact, Alder's sales agents do not represent ADT, nor is Alder affiliated with ADT.

70.      ADT US Holdings owns the ADT Trademarks.  ADT LLC uses the ADT Trademarks under license from ADT US Holdings.  Both are injured by any effort by defendants to confuse ADT's customers as to the affiliations of defendants' sales agents with ADT.

71.      The ADT trademarks are registered, valid and entitled to the highest level of protection provided by the trademark laws.

72.      Alder's sales agents use without license the identical ADT word trademark in their false sales pitches to ADT's customers.

73.     Alder competes with ADT for a common pool of customers.  Alder and ADT sell substantially identical alarm equipment and monitoring services, using substantially identical equipment and pricing structures, in the same markets, through the same sales and advertising channels, to the same target market of residential alarm services buyers.

74.     Alder, through its sales agents, made these false representations to ADT's customers with the intent of deceiving ADT's customers as to a relationship or affiliation with ADT that does not exist, and that has never existed.

75.     ADT's customers are actually confused by the Alder agents' false representations of ADT affiliation, and in their confusion allow the agents into their homes and sign Alder contracts in the mistaken belief that they are accepting an upgrade of their ADT equipment and services.

76.     Mr. Schanz actively directs and controls Alder's sales efforts.

77.     On information and belief, Alder Protection Holdings participates in Alder's alarm sales business, and serves as an agent and alter ego of Alder Holdings and Mr. Schanz.  The remaining defendants, as alter egos consistent with the preceding allegations, enable Alder's sales *inter alia* by financing them as part of the Alder enterprise.

78.     Mr. Schanz created "Alder" and its predecessors and affiliates as a confused enterprise comprised of dozens of entities, all undercapitalized, and all created as part of an effort to mislead and frustrate creditors like ADT.

79.     Mr. Schanz's efforts, now, to avoid his commitments under the parties' *Alarm Protection* settlement by arguing that the settlement's security arrangement binds

only "Alder," and not all defendants, [*Alarm Protection* DE 429] further illustrate how Mr. Schanz tries to manipulate the various entities in the "Alder" enterprise to isolate and avoid his obligations to creditors, including ADT.

80.     ADT has been damaged as a result of Alder's false representations.  They confuse the market for ADT's goods and services; they disrupt ADT's relationships with its customers; they cause ADT's customers to withhold trade from ADT; they damage ADT's brand, goodwill and reputation as a reliable provider of security systems; they enable Alder to avoid royalties for the use of ADT's word trademark in commerce; and they unjustly enrich Alder at ADT's expense.

81.     ADT is entitled to an award of compensatory damages, as well as defendants' profits, attorney fees, and the costs of this action pursuant to 15 U.S.C. § 1117(a).  The court, pursuant the discretion confided to it under this section of the Act, should consider trebling these damages to compensate ADT fully for its losses.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against defendants, and award the following relief:

a.     Compensatory damages, in an amount to be found at trial of this cause, but believed to be no less than $17,000,000;

b.     An accounting of defndants' profits resulting from their deceptive practices, and payment of such profits to ADT;

c.     Attorney fees and costs incurred in the prosecution of this action, as provided by 15 U.S.C. § 1117(a); and

d.     Such other and further relief as the Court may deem appropriate in the circumstances.

## COUNT III
## UNFAIR COMPETITION AT COMMON LAW

82.     Plaintiffs incorporate Paragraphs 1 through 59, as if set forth fully here.

83.     Alder, at Mr. Schanz's direction, trains its sales agents to misrepresent themselves to ADT customers as being affiliated somehow with ADT.  Alder and its agents use these false representations of affiliation to confuse ADT's customers as to the agents' true affiliation, to interest ADT's customers in their pitches, to win the customers' trust, and to gain access to their homes.

84.     In fact, Alder's sales agents do not represent ADT, nor is Alder affiliated with ADT.

85.     The Alder sales agents' interference with ADT's contractual relationships with its customers, their use of false representations of ADT affiliation as described in the preceding paragraphs, and their efforts to prey on elderly or infirm ADT customers is contrary to honest practice in industrial or commercial matters.

86.     The Alder sales agents' false sales pitches are frauds on the customers, knowing and willful.  Alder knows about the frauds, encourages them, and does nothing to stop them, even after agreeing in *Alarm Protection* to an injunction that prohibits these exact false representations of ADT affiliation to ADT's customers.

87.     These frauds are likely to cause confusion among ADT's customers, and in fact already have caused confusion among them.

88.     ADT US Holdings owns the ADT Trademarks.  ADT LLC uses the ADT Trademarks under license from ADT US Holdings.  Both are injured by any effort by defendants to confuse ADT's customers as to the affiliations of defendants' sales agents with ADT.

89.     The ADT trademarks are registered, valid and entitled to the highest level of protection provided by the trademark laws.

90.     Alder's sales agents use without license the identical ADT word trademark in their false sales pitches to ADT's customers.

91.     Alder competes with ADT for a common pool of customers.  Alder and ADT sell substantially identical alarm equipment and monitoring services, using substantially identical equipment and pricing structures, in the same markets, through the same sales and advertising channels, to the same target market of residential alarm services buyers.

92.     Alder, through its sales agents, made these false representations to ADT's customers with the intent of deceiving ADT's customers as to a relationship or affiliation with ADT that does not exist, and that has never existed.

93.     ADT's customers are actually confused by the Alder agents' false representations of ADT affiliation, and in their confusion allow the agents into their homes and sign Alder contracts in the mistaken belief that they are accepting an upgrade of their ADT equipment and services.

94.     Mr. Schanz actively directs and controls Alder's sales efforts.

95.     On information and belief, Alder Protection Holdings participates in Alder's alarm sales business, and serves as an agent and alter ego of Alder Holdings and Mr. Schanz.  The remaining defendants, as alter egos consistent with the preceding allegations, enable Alder's sales by financing them as part of the Alder enterprise.

96.     Mr. Schanz created "Alder" and its predecessors and affiliates as a confusing enterprise comprised of dozens of entities, all undercapitalized, and all created as part of an effort to mislead and frustrate creditors like ADT.

97.     Mr. Schanz's efforts, now, to avoid his commitments under the parties' *Alarm Protection* settlement by arguing that the settlement's security arrangement binds only "Alder," and not all defendants, [*Alarm Protection* DE 429] further illustrate how Mr. Schanz tries to manipulate the various entities in the "Alder" enterprise to isolate and avoid his obligations to creditors, including ADT.

98.     ADT has been damaged as a result of Alder's false representations.  They confuse of the market for ADT's goods and services; they disrupt ADT's relationships with its customers; they cause ADT's customers to withhold trade from ADT; they damage ADT's brand, goodwill and reputation as a reliable provider of security systems; they enable Alder to avoid royalties for the use of ADT's word trademark in commerce; and they unjustly enrich Alder at ADT's expense.

99.     In addition, the willful and intentional nature of the torts described in this Complaint justifies an award of punitive damages in an amount sufficient to deter defendants from continuing to engage in unfair competition in the market for electronic security services.

WHEREFORE, ADT respectfully requests that the Court enter judgment in its favor and against defendants, and award the following relief:

a.      Compensatory damages, in an amount to be found at the trial of this cause, but believed to be no less than $17,000,000;

b.      Punitive damages in a sum sufficient to deter defendants from engaging in further deceptive sales tactics; and

c.      Such other and further relief as the Court may deem appropriate in the circumstances.

## JURY DEMAND

ADT demands a jury trial of all issues that are triable to the jury.

Dated:  May 31, 2018

Respectfully submitted,

**McNEW P.A.**

s/ C. Sanders McNew

—————————————————————

C. Sanders McNew
mcnew@mcnew.net
Florida Bar No. 0090561
2385 NW Executive Center Drive, Suite 100
Boca Raton, Florida  33431
Tel: (561) 299-0257

*-and-*

**SHOOK, HARDY & BACON LLP**

Richard G. Sander (*pro hac vice*)
rsander@shb.com
1660 17th Street, Suite 450
Denver, Colorado 80202
Tel: (303) 285-5300

Charles C. Eblen (*pro hac vice*)
ceblen@shb.com
2555 Grand Boulevard
Kansas City, Missouri 64108
Tel: (816) 474-6550

*Counsel for the Plaintiffs, ADT LLC*
  *-and- ADT US Holdings, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 31st day of May, 2018, I caused a true and correct copy of the foregoing Second Amended Complaint to be served by CM/ECF on all parties listed to receive electronic service for this case.

s/ C. Sanders McNew
_____
C. Sanders McNew
