UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
PALM BEACH DIVISION
No. 9:17-cv-81237-Rosenberg/Reinhart

ADT LLC and ADT US HOLDINGS, INC.,

Plaintiffs,

v.

ALDER HOLDINGS, LLC, *et al*.,

Defendants.

_____/

### DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' SECOND AMENDED COMPLAINT (DE 85) AND COUNTERCLAIM-PLAINTIFF ALDER HOLDING, LLC'S COUNTERCLAIM AGAINST COUNTERCLAIM-DEFENDANT, ADT LLC

Defendants, by their undersigned counsel, file their Answer and Affirmative Defenses to Plaintiffs' Second Amended Complaint (DE 85), and Counterclaim-Plaintiff, Alder Holdings, LLC's Counterclaim against Counterclaim-Defendant ADT, LLC in the above captioned action ("*ADT III*"), and state as follows:

### ANSWER TO SECOND AMENDED COMPLAINT

Defendants deny the statement in the introduction of the Second Amended Complaint (DE 85) that Defendants collectively are doing business as "Alder".

1. Defendants admit that Alder Holdings, LLC competes with ADT, LLC. Defendants admit that Alder Holdings, LLC sells residential alarm systems door to door.  Defendants admit that sometimes Alder Holdings, LLC sells alarm systems to ADT customers and sometimes upgrade ADT customers by installing new Alder equipment.  Defendants admit that customers of Alder Holdings, LLC typically sign a five year contract.  Defendants admit that there was a prior action, *ADT LLC v. Alarm Protection LLC,* No. 9:15-cv-80073, which was

1

settled by the parties on May 24, 2017 ("*ADT II*").  Defendants deny all remaining allegations and demand strict proof thereof.

2.   Defendants admit that, except for Alder Protection Holdings, LLC, Defendants were parties to *ADT II*. Defendants admit that the parties reached a settlement of *ADT II* on May 24, 2017. Defendants admit that the Court entered a Permanent Injunction in *ADT II* on October 20, 2017.  Defendants deny all other allegations and demand strict proof thereof.

3.   Defendants deny the allegations and demand strict proof thereof.

4.   Defendants are without knowledge of the allegations and thus deny those allegations and demand strict proof thereof.

5.   Defendants are without knowledge of the allegations and thus deny those allegations and demand strict proof thereof.

6.   Defendants admit that all of the Defendants which are limited liability companies, except for Alder Protection Holdings LLC, are Utah limited liability companies.  Defendants admit that Adam Schanz is a citizen of Utah and lives in Utah.  Defendants admit that each of the limited liability companies maintain offices at 450 North 1500 West, Orem, Utah 84057 and have designated Corporation Service Company, 10 E. South Temple, Suite 850, Salt Lake City, Utah 84133 as their agent for service of process.  Defendants admit that Alder Holdings, LLC adopted the trade name "Alder" in early 2015.  Defendants deny all other allegations and demand strict proof thereof.

7.   Defendants admit that Alder Holdings LLC is a Utah limited liability company.  Defendants admit that Alder Holdings LLC began to sell, install and service alarm accounts in 2015.  Defendants admit the allegations in the third and fourth sentences.  Defendants deny all other allegations and demand strict proof thereof.

8.   Defendants admit the first and second sentences.  Defendants deny all remaining allegations and demand strict proof thereof.

9.   Defendants admit that Mr. Schanz lives in Utah and is a citizen of Utah.  Defendants deny all remaining allegations and demand strict proof thereof.

10.  Defendants admit the allegations.

11.  Defendants admit the allegations.

12.  Defendants deny the allegations and demand strict proof thereof.

13.  Defendants are without knowledge of the allegations and thus deny the allegations and demand strict proof thereof.

14.  Defendants admit the allegations.

15.  Defendants are without knowledge of the allegations and thus deny the allegations and demand strict proof thereof.

16.  Defendants admit that Alder and ADT compete in the market for residential electronic security systems and sell similar goods.  Defendants further admit that ADT operates in each of the states in which Alder sells alarm systems.  Defendants deny the remaining allegations and demand strict proof thereof.

17.  Defendants admit that ADT has named Defendants other than Alder Holdings, LLC as Defendants.  Defendants deny all remaining allegations and demand strict proof thereof.

18.  Defendants admit that Articles of Organization were filed with the Utah Department of Commerce Division of Corporations on December 31, 2008.  Defendants admit that other state entities affiliated with Alarm Protection Technology, with the words "Alarm Protection Technology" in their entity names were organized during the period of late 2011 and late 2012 and operated during the period through the period of February 2013 through April

2015.  These entities used the trade name "APT" through early 2013, and, along with the Alarm Protection entities, used the "Alarm Protection" tradename from early 2013 through early 2015.  Defendants deny all remaining allegations and demand strict proof thereof, and aver that a jury verdict was returned in favor of the defendants, a final judgment was entered in favor the defendants in February 2015 with respect to ADT's claim that the "APT" trademark caused a likelihood of confusion with the "ADT trademark under the Lanham Act and the Florida Deceptive and Unfair Trade Practice Act, and the final judgment was affirmed on appeal by the United States Court of Appeals for the Eleventh Circuit.  *See ADT LLC v. Alarm Protection Technology Florida, LLC*, 646 Fed. Appx. 781 (11th Cir. 2016) ("*ADT I*").

19. Defendants admit that in early 2013, the Court entered a preliminary injunction precluding use of the "APT" mark, but that after final judgment was entered in favor of the defendants on the jury's verdict in *ADT I*, Alarm Protection moved to recover on the injunction bond posted by ADT, and the United States District Court in *ADT I* granted the motion over ADT's objection. Defendants further admit that Alder Holdings LLC and Alarm Protection state entities, as dealers, began using the "Alder" tradename in early 2015, but that Alder Louisiana LLC began using the "Alder" tradename in 2016.  These state entities include including Alarm Protection Alabama, LLC, Alarm Protection California, LLC, Alarm Protection Georgia, LLC, Alarm Protection Mississippi, LLC, Alarm Protection, Tennessee LLC, Alarm Protection, Texas LLC, Alarm Protection, Alaska LLC, Alarm Protection Arkansas, LLC, Alarm Protection, Kentucky LLC and Alarm Protection, Oklahoma LLC (the "Alarm Protection State Entities").  Defendants deny the remaining allegations and demand strict proof thereof.

20. Defendants admit that Rhodesian Protection, LLC was organized in 2013 and is the sole member of the Alarm Protection State Entities, that the sole member of Rhodesian Protection, LLC as of April 2015 is Alarm Protection Technology, LLC, and that Mr. Schanz was the sole member and manager of Rhodesian Protection, LLC until on or about April 2015.  Defendants deny the remaining allegations and demand strict proof thereof.

21. Defendants admit that Mr. Schanz transferred his membership interest in Rhodesian Protection, LLC to Alarm Protection Technology, LLC on or about April 2015, and that Mr. Schanz is the sole member of Alarm Protection Technology, LLC and Boerboel Protection, LLC.  Defendants deny the remaining allegations and demand strict proof thereof.

22. Defendants admit that Boerboel Protection, LLC is the sole member of Alder Holdings, LLC, and that Mr. Schanz is the sole member and manager of Boerboel Protection, LLC. Defendants deny the remaining and demand strict proof thereof.

23. Defendants admit that, starting in April 2015, the Alarm Protection State Entities started selling new alarm systems as dealers for Alder Holdings, and that, between April 2015 and January 1, 2016, the Alarm Protection State Entities, on a rolling basis, stopped making any new sales of alarm systems, while, at the same time, Alder Holdings, LLC started selling and serving alarm systems directly in the relevant states.  Defendants deny the remaining allegations and demand strict proof thereof.

24. Defendants admit that some of the sales representatives who formerly worked for the Alarm Protection, LLC entities subsequently worked as sales representatives for Alder Holdings, LLC, and that by January 1, 2016, Alder Holdings, LLC had taken over operations formerly performed by Alarm Protection Technology, LLC, including payroll services, accounting services, billing services, customer-services services, payment of sales commission,

management of the sales force and training of the sales force.  Defendants deny all remaining allegations and demand strict proof thereof.

25. Defendants admit that the Alarm Protection State Entities stopped selling alarm accounts prior to January 1, 2016, but each own alarm accounts that the particular state entity previously sold.  Defendants further admit that the Alarm Protection State Entities do not collect or disburse alarm account payments through their own bank accounts.  Defendants further admit that the Alarm Protection, LLC entities do not provide services or support to the accounts that they own.  Defendants deny the remaining allegations and demand strict proof thereof.

26. Defendants admit the allegations.

27. Defendants deny the allegations and demand strict proof thereof.

28. Defendants admit that Alarm Protection State Entities, such as Alarm Protection Florida, LLC, currently rely upon Alder for its administrative, operational, marketing, customer support and customer communications functions, and that Alarm Protection Florida, LLC has no office in Florida.  Defendants deny the remaining allegations and demand strict proof thereof.

29. Defendants admit that the Alarm Protection State Entities opened up bank accounts with initial deposits, and that sales revenues are not being deposited into Alarm Protection state entity bank accounts.  Defendants deny the allegations and demand strict proof thereof.

30. Defendants deny the allegations and demand strict proof thereof.

31. Defendants deny the allegations and demand strict proof thereof.

32. Defendants deny the allegations and demand strict proof thereof.

33. Defendants admit that Alder Holdings, LLC was organized in December 2014, two months before a jury trial in *ADT I* on February 17-20 and 24, 2015, in which final judgment was entered in favor of Alarm Protection Technology Florida, LLC, Alarm Protection Technology, LLC, Alarm Protection Technology Holdings, LLC, Alarm Protection Technology Management, LLC and Mr. Schanz, and against Plaintiff ADT LLC, on all counts. Defendants deny the remaining allegations and demand strict proof thereof, and refer the Court to Mr. Schanz's Trial Testimony at page 206, lines 6-7 of Trial Transcript Volume I in the *ADT I* lawsuit for testimony that directly refutes the false allegation by ADT about Mr. Schanz's trial testimony.

34. Defendants admit that Boerboel Protection, LLC and Alder Louisiana, LLC were created during the pendency of *ADT II*, and that certain discovery was taken by ADT regarding the corporate structure of Alder Holdings, LLC and certain affiliates.  Defendants deny the allegations and demand strict proof thereof.

35. Defendants admit that Alder Protection Holdings LLC was organized in the State of Delaware on January 1, 2017, and that certain of the Defendants have been subject to certain regulatory and/or litigation matters in Utah, Texas and/or Alaska that allege deceptive sales practices.  Defendants deny the remaining allegations and demand strict proof thereof.

36. Defendants deny the allegations and demand strict proof thereof.

37. Defendants deny the allegations and demand strict proof thereof.

38. Defendants deny the allegations and demand strict proof thereof.

39. Defendants deny the allegations and demand strict proof thereof.

40. Defendants deny the allegations and demand strict proof thereof.

41. Defendants deny the allegations and demand strict proof thereof.

42. Defendants deny the allegations and demand strict proof thereof.

43. Defendants deny the allegations and demand strict proof thereof.

44. Defendants deny the allegations and demand strict proof thereof.

45. Defendants deny the allegations and demand strict proof thereof.

46. Defendants admit that Plaintiffs filed a lawsuit against certain Defendants for injunctive relief prior to the *ADT I* jury trial (which ADT lost on all counts) in early 2015 but deny all remaining allegations and demand strict proof thereof.

47. In response to Paragraph 46, Defendants also admit that there was, on May 24, 2017, a settlement between the parties to the prior lawsuit (*ADT II* DE 438 at 2; DE 414) which resulted in the Court's issuance of a Permanent Injunction on October 20, 2017 (*ADT II*, DE 431). Defendants deny any remaining allegations and demand strict proof thereof.

48. Defendants admit the allegations.

49. Defendants deny the allegations and demand strict proof thereof.

50. Defendants deny the allegations and demand strict proof thereof.

51. Defendants deny the allegations and demand strict proof thereof.

52. Defendants deny the allegations and demand strict proof thereof.

53. Defendants deny the allegations and demand strict proof thereof.

54. Defendants deny the allegations and demand strict proof thereof.

55. Defendants deny the allegations and demand strict proof thereof.

56. Defendants deny the allegations and demand strict proof thereof.

57. Defendants deny the allegations and demand strict proof thereof.

58. Defendants deny the allegations and demand strict proof thereof.

59. Defendants deny the allegations and demand strict proof thereof.

60. Defendants incorporate their responses to the allegations of Paragraphs 1 through 59 as though set forth herein.

61. Defendants admit that, on February 2, 2018, ADT's outside litigation attorneys sent a letter to Defendants' outside litigation attorneys, titled Amended Notice of Alleged Violations, followed by sending a Spreadsheet of Customers.  Defendants deny the remaining allegations and demand strict proof thereof.

62. Defendants admit that the parties engaged in some dispute resolution procedures only after ADT was expressly ordered to do so by this Court (*ADT II* DE 438 at 9-10) (rejecting ADT's position that ADT "has the unilateral right to completely ignore the terms of the injunction and the terms of the parties' settlement agreement," and holding that "[t]he settlement agreement and injunction clearly require Plaintiff to follow a dispute resolution procedure if Plaintiff believes that the Court's injunction has been violated.")  The Defendants deny that ADT actually conducted any dispute resolution procedures in good faith after ADT was ordered by the Court *not* to ignore the dispute resolution procedures mandated by the Court in the Permanent Injunction.

63. Defendants deny the allegations and demand strict proof thereof.

64. Defendants admit that ADT served another Notice of Violations on May 22, 2018, and that ADT is only allowed recovery under Count I based on the violations that the parties are unable to resolve through the dispute resolution process.  In contempt of the Permanent Injunction in *ADT II*, ADT has contacted Alder's customers (former ADT customers) to elicit sworn testimony and scheduled depositions before even serving a written notice of violation in relation to those Alder customers.  Defendants deny the allegations and demand strict proof thereof.

65. Defendants deny the allegations and demand strict proof thereof.

66. Defendants deny the allegations and demand strict proof thereof.

67. Defendants incorporate their responses to the allegations of Paragraphs 1 through 59 as though set forth herein.

68. Defendants deny the allegations and demand strict proof thereof.

69. Defendants admit these allegations.

70. Defendants are without knowledge of the allegations in the first and second sentences and thus deny the allegations and demand strict proof thereof.  Defendants deny the remaining allegations and demand strict proof thereof.

71. Defendants are without knowledge of the allegations and thus deny the allegations and demand strict proof thereof.

72. Defendants deny the allegations and demand strict proof thereof.

73. Defendants admit that Alder and ADT compete for customers and that both sell similar alarm services equipment and monitoring services.  Defendants deny the remaining allegations and demand strict proof thereof.

74. Defendants deny the allegations and demand strict proof thereof.

75. Defendants deny the allegations and demand strict proof thereof.

76. Defendants deny the allegations and demand strict proof thereof.

77. Defendants deny the allegations and demand strict proof thereof.

78. Defendants deny the allegations and demand strict proof thereof.

79. Defendants deny the allegations and demand strict proof thereof.

80. Defendants deny the allegations and demand strict proof thereof.

81. Defendants deny the allegations and demand strict proof thereof.

82. Defendants incorporate their responses to the allegations of Paragraphs 1 through 59 as though set forth herein.

83. Defendants deny the allegations and demand strict proof thereof.

84. Defendants admit these allegations.

85. Defendants deny the allegations and demand strict proof thereof.

86. Defendants deny the allegations and demand strict proof thereof.

87. Defendants deny the allegations and demand strict proof thereof.

88. Defendants are without knowledge of the allegations in the first and second sentences and thus deny the allegations and demand strict proof thereof.  Defendants deny the remaining allegations and demand strict proof thereof.

89. Defendants are without knowledge of the allegations and thus deny the allegations and demand strict proof thereof.

90. Defendants deny the allegations and demand strict proof thereof.

91. Defendants admit that Alder and ADT compete for customers and that both sell similar alarm services equipment and monitoring services.  Defendants deny the remaining allegations and demand strict proof thereof.

92. Defendants deny the allegations and demand strict proof thereof.

93. Defendants deny the allegations and demand strict proof thereof.

94. Defendants deny the allegations and demand strict proof thereof.

95. Defendants deny the allegations and demand strict proof thereof.

96. Defendants deny the allegations and demand strict proof thereof.

97. Defendants deny the allegations and demand strict proof thereof.

98. Defendants deny the allegations and demand strict proof thereof.

99. Defendants deny the allegations and demand strict proof thereof.

To the extent not otherwise addressed above, Defendants deny all allegations and claims for relief and demand strict proof thereof.

## AFFIRMATIVE DEFENSES

### First Affirmative Defense:  Personal Jurisdiction (All Counts)

This Court does not have personal jurisdiction over Alder Protection Holdings, LLC, Boerboel Protection, LLC, Rhodesian Protection, LLC, Alarm Protection Technology, LLC, Alarm Protection Management, LLC, Alarm Protection Alabama, LLC, Alarm Protection California, LLC, Alarm Protection Georgia, LLC, Alarm Protection Mississippi, LLC, Alarm Protection Tennessee, LLC, Alarm Protection Texas, LLC, Alarm Protection Alaska, LLC, Alarm Protection Arkansas, LLC, Alarm Protection Kentucky, LLC, Alarm Protection Oklahoma, LLC, and Adam Schanz.

### Second Affirmative Defense: Collateral Estoppel (Counts II and III)

Plaintiffs' claims are barred by the affirmative defense of collateral estoppel.  Paragraphs 18-20 and 37-45, which are incorporated by reference into Counts II and III, include identical allegations relating to the APT acronym and alleged violations of the Lanham Act and state unfair competition law prior to February 25, 2015, when final judgment in favor of the *ADT I* defendants and against ADT LLC was entered upon the jury's verdict where those issues were actually litigated as a critical and necessary part of the judgment in *ADT I*.  *See Tampa Bay Water v. HDR Eng'g, Inc.*, 731 F.3d 1171, 1180 (11th Cir. 2013).  Therefore, Plaintiffs are collaterally estopped from litigating those particular pre-February 2015 claims of alleged violations of the Lanham Act and state law unfair competition.

### Third Affirmative Defense: Res Judicata (Counts II and III)

Plaintiffs' claims are barred by the affirmative defense of res judicata. Paragraphs 18-20 and 37-45, which are incorporated by reference into Counts II and III, include allegations relating to the APT acronym and events prior to February 25, 2015, when final judgment in favor of the *ADT I* defendants and against ADT LLC.  Those allegations were actually asserted in the earlier action and resulted in a final judgment against ADT LLC in *ADT I* on February 25, 2015. *See In re Piper Aircraft Corp.*, 244 F. 3d 1289, 1298-99 (11th Cir. 2001).

**Fourth Affirmative Defense:  Release (Counts II and III)**

Any claims asserted by ADT alleging violations of the Lanham Act and state unfair competition law prior to May 24, 2017, are barred by the affirmative defense of release.  On May 24, 2017, the parties in *ADT II*, including ADT LLC and ADT Holdings, Inc. "agreed to a full release, a mutual release. . . ."  (*ADT II*, DE 414 at 7-8).

**Fifth Affirmative Defense:  Settlement (Counts II and III)**

Any claims asserted by ADT alleging violations of the Lanham Act and state unfair competition law prior to May 24, 2017, are barred by the affirmative defense of settlement.  On May 24, 2017, the parties in *ADT II* entered into a settlement agreement, which included as an essential term, that the *ADT II* parties, including ADT LLC and ADT Holdings, Inc. "agreed to a full release, a mutual release. . . ."  (*ADT II*, DE 414 at 7-8).

**Sixth Affirmative Defense:  Judicial Estoppel (Counts II and III)**

Any claims asserted by Plaintiffs alleging violations of the Lanham Act and state unfair competition law prior to May 24, 2017, are barred by the affirmative defense of judicial estoppel. On May 24, 2017, the parties in *ADT II* agreed to a settlement in open court, which included, as an essential term of the settlement agreement, that ADT LLC and ADT Holdings, Inc. "agreed to a full release, a mutual release. . . ."  (*ADT II*, DE 414 at 7-8).   ADT's inclusion of allegations of

violations of the Lanham Act and state unfair competition law by the Defendants prior to May 24, 2017, in this *ADT III* lawsuit is clearly inconsistent with Plaintiffs' representation that Plaintiffs were fully releasing their claims against the *ADT II* Defendants as of May 24, 2017. The United States District Court relied upon the parties' settlement agreement in removing the case in *ADT II* from its trial calendar and entering a Permanent Injunction based on that May 24, 2017, Settlement Agreement in *ADT II*, and the United States District Court was misled in doing so if it were to accept the position that Plaintiffs are permitted to circumvent or act against the terms of the parties' Settlement Agreement in *ADT II*.  (*See ADT II* DE 438 at 6-7).  Finally, it would be unfair for Plaintiffs to avoid an essential term of the May 24, 2017, Settlement Agreement while the *ADT II* Defendants complied with the essential terms of the Settlement Agreement that were read into the record at the May 24, 2017, settlement conference.  (*See ADT II* DE 438 at 6-7).

**Seventh Affirmative Defense:  Waiver (Counts II and III)**

Any claims asserted by Plaintiff involving alleged conduct prior to May 24, 2017, are barred by the affirmative defense of waiver.  On May 24, 2017, the parties in ADT II entered into a Settlement Agreement, which included as an essential term, that the *ADT II* parties, including ADT LLC and ADT Holdings, Inc. "agreed to a full release, a mutual release. . . ." (ADT II, DE 414 at 7-8).  This agreement was a voluntary relinquishment of a known right by Plaintiffs to sue for violations of law by Defendants prior to May 24, 2017.

**Eight Affirmative Defense: Corporate Veil (All Counts)**

Plaintiffs' claims against Boerboel Protection LLC, Rhodesian Protection LLC, Alarm Protection Technology, LLC, Alarm Protection Management, LLC, and Adam Schanz fail to state a claim as a matter of law because "[l]imited liability is the rule not the exception; and on

that assumption large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted." *Anderson v. Abbott*, 321 U.S. 349, 361-62 (1944).  "Finding this arrangement useful to commerce, the Florida courts will not easily disregard this fiction." *Molinos Valle Del Cibao v. Lama*, 633 F.3d 1330 (11th Cir. 2011). "Courts have refused to pierce the corporate veil even when subsidiary corporations use the trade name of the parent, accept administrative support from the parent and have a significant economic relationship with the parent." *Pearson v. Component Tech*, 247 F.3d 471, 485 (3rd Cir. 2001). It is black letter law in Florida that to disregard this corporate fiction and hold the corporation's owners liable—to "pierce the corporate veil"—the plaintiff must prove that: (1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact non-existent and the shareholders were in fact alter egos of the corporation; (2) the corporate form must have been used fraudulently or for an improper purpose; (3) the fraudulent or improper use of the corporate form caused injury to the claimant. *Lama*, 633 F.3d 1330, 1349.  The Second Amended Complaint does not plead any facts in support of these elements upon which the corporate veil could be pierced under the established standard of Florida law.  Likewise, the Alarm Protection State Entities are not liable for the acts of their Alarm Protection State Entity parent corporations or affiliates under the same doctrine.

### Ninth Affirmative Defense: Standing (All Counts)

ADT US Holdings, Inc. lacks standing to bring these claims because it does not own any contracts with ADT customers, so that it does not have a sufficient interest at stake in the controversy that will be affected by the litigation's outcome.

### Tenth Affirmative Defense: Puffery/First Amendment (All Counts)

Defendants' alleged misrepresentations are non-actionable puffery and expressions of opinion not made as representations of fact, and, as such, are not violations of the Lanham Act or the October 20, 2017, Permanent Injunction.  Defendants' use of the term upgrade and other opinions alleged by Plaintiffs as factual misrepresentations, therefore, are protected by the First Amendment to the United States Constitution.

**Eleventh Affirmative Defense: Nominative Fair Use (All Counts)**

Defendants' alleged use of the trademark "ADT" qualifies as nominative fair use, since any use of the mark "ADT" by Defendants is for the purposes of comparison and/or criticism only, and used as part of Defendants' efforts to show the customer why Defendants' products and services are superior to those of Plaintiffs.

**Twelfth Affirmative Defense: Failure to Mitigate Damages (All Counts)**

Plaintiffs have failed to mitigate their damages (if any exist).

**Thirteenth Affirmative Defense: Punitive Damages (Count III)**

Any award of punitive damages in this case is impermissible under the standards established in the case of *BMW of North America, Inc. v. Gore*, 517 US 559 (1996) and its progeny.

**Fourteenth Affirmative Defense: Punitive Damages (Count III)**

Any award of punitive damages in this case would violate the due process requirements of the Fourteenth Amendment to the US Constitution and the Florida Constitution.

**Fifteenth Affirmative Defense: Ripeness/Failure to Satisfy Condition Precedent (All Counts)**

Plaintiffs' claims are precluded because Plaintiffs have not complied with the dispute resolution process mandated by the May 24, 2017, Settlement Agreement and the October 20, 2017, Permanent Injunction in *ADT II*.  The *ADT II* Settlement Agreement (DE 414) and the

*ADT II* Permanent Injunction (DE 431) both mandate that ADT must <u>*first*</u> provide written notice to Defendants of the alleged violations and further provide all facts and all recordings *in their entirety* supporting such violations, that the parties will work together in good faith to bring a prompt resolution of the dispute concerning the alleged violation, and, then, if the dispute is not resolved with 14 days of the written notice, the parties will mediate the alleged violations.  Only if the dispute is not resolved after appropriate written notice, provision of the materials supporting the violation in their entirety, a good faith effort to resolve the complaints, and mediation, ADT may then seek appropriate relief with the Court.  (*ADT II* DE 431 at 3).  On January 11, 2018, the *ADT II* Court expressly rejected ADT's position that ADT "has the unilateral right to completely ignore the terms of the injunction and the terms of the parties' settlement agreement," and held that "[t]he settlement agreement and injunction clearly require Plaintiff to follow a dispute resolution procedure if Plaintiff believes that the Court's injunction has been violated."  (*ADT II* DE 438 at 9-10).  The *ADT II* Court held that "[t]he injunction clearly and unambiguously requires Plaintiff to pursue its remedies for a violation of the injunction through certain defined procedures – any other interpretation of the injunction renders Plaintiffs' agreement to this provision meaningless and illusory."  (*ADT II* 438 at 10).  Despite these contractual and court-ordered requirements, ADT blatantly has ignored the dispute resolution procedures by engaging in scheduling depositions of particular customers (and attempting to elicit their sworn testimony) prior to sending Defendants the required written notice of these particular (alleged) violations and all facts and recordings in their entirety for meaningful review by Defendants and prior to any good faith discussions and mediation between the parties of these particular customer complaints.  ADT even has refused to allow management or sales representatives at Alder to review any of the materials.  As the Court noted on January

17

11, 2018, ADT cannot accept the benefits of the May 24, 2017, Settlement Agreement, without complying with the essential terms of that agreement.  To do so, "renders Plaintiffs' agreement to this provision meaningless and illusory." (*ADT II* DE 438 at 10).

**Sixteenth Affirmative Defense: First Breach (Count I)**

Plaintiffs' claim in Count I is barred by the first breach doctrine, as Plaintiffs have breached the May 24, 2017, Settlement Agreement, so that the Settlement Agreement (which included an injunction) cannot be enforced.  The Settlement Agreement entered by the parties in *ADT II* (DE 414) mandates that, before ADT files and motion for contempt or motion to enforce the injunction, ADT will provide written notice of the alleged violations and all facts and all recordings in their entirety supporting such violations, that the parties will work together in good faith to bring a prompt resolution of the dispute concerning the alleged violation, and, then, if the dispute is not resolved with 14 days of the written notice, the parties will mediate the alleged violations.  Only if the dispute is not resolved after mediation may ADT seek appropriate relief with the Court.  (*ADT II* DE 431 at 3).  On January 11, 2018, the *ADT II* Court rejected ADT's position that ADT has the unilateral right to completely ignore the terms of the parties' May 24, 2017, Settlement Agreement, and held that the settlement agreement clearly requires Plaintiff to follow a dispute resolution procedure.  (*ADT II* DE 438 at 9-10).  ADT first breached the May 24, 2017, Settlement Agreement in *ADT II* by failing to follow the dispute resolution procedures by engaging in scheduling depositions of customers (and attempting to elicit their sworn testimony) *prior to* sending Defendants the contractually required written notice of the alleged violations and all facts and recordings in their entirety for review by Defendants and *prior to* any good faith discussions and mediation between the parties of these particular customer complaints.  Moreover, ADT has not provided the contractually required information for review

by anyone other than Alder's attorneys, which was not a condition of the May 24, 2017, Settlement Agreement.  As the Court noted on January 11, 2018, ADT cannot accept the benefits of the May 24, 2017, Settlement Agreement, without complying with the essential terms of that agreement.  To do so, "renders Plaintiffs' agreement to this provision meaningless and illusory." (DE 438 at 10).  Plaintiffs also have breached the implied covenant of good faith and fair dealing that is contained in the May 24, 2017, Settlement Agreement by operation of law.  Therefore, Plaintiffs have first breached the May 24, 2017, Settlement Agreement, and Defendants are excused from further performance under the first breach doctrine.

**Seventeenth Affirmative Defense: Estoppel (All Counts)**

Plaintiffs' claims are barred by estoppel for those particular customers for whom Plaintiffs have not complied with the dispute resolution requirements of the May 24, 2017, Settlement Agreement. Plaintiffs represented they would comply with the May 24, 2017, Settlement Agreement, which resulted in the October 20, 2017, Permanent Injunction, Defendants relied on that representation to their detriment and changed their position based on the May 24, 2017, Settlement Agreement by paying ADT $1 million in September 2017 as part of the parties' Settlement Agreement. After accepting the $1 million payment but failing to do what Plaintiffs represented they would do in open court on May 24, 2017, Plaintiffs now are estopped by their actions from seeking relief for any of the actions alleged in the Second Amended Complaint.

**Eighteenth Affirmative Defense:  Unclean Hands (All Counts)**

Plaintiffs' claims are barred by the doctrine of unclean hands for those particular customers for whom Plaintiffs have not complied with the dispute resolution requirements of the May 24, 2017, Settlement Agreement, which resulted in the October 20, 2017, Permanent

Injunction. Plaintiffs, through their outside litigation counsel, have communicated directly with particular customers (including Alder customers) that allegedly have complained about Alder, and those communications occurred *prior to* ADT sending Defendants any written notice of violation, engaging in good faith efforts to resolve those particular customers' complaints with Defendants, or conducting mediation regarding those particular customers' complaints. These premature *ex parte* contacts by ADT's outside litigation counsel have included inequitable and bad faith attempts to elicit testimony against Defendants and scheduling of depositions prior to sending Defendants any written notice of violation with respect to those particular customers. Plaintiffs also have refused in bad faith to allow the management and sales representatives of Alder to review any information that ADT was required to produce pursuant to the May 24, 2017, Settlement Agreement and the October 20, 2017, Permanent Injunction.  Alder has been injured by Plaintiffs' inequitable and bad faith conduct by suffering customer contract cancellations resulting from Plaintiffs' misconduct, and by having to pay attorneys to attend for depositions of customers whose complaints were required to be first submitted to the dispute resolution process outlined in the parties' May 24, 2017, Settlement Agreement in open court. Alder has been further injured by paying Plaintiffs $1 million in consideration for Plaintiffs' agreement to comply with the dispute resolution procedures agreed to in open court by Plaintiff on May 24, 2017.  Plaintiffs have rendered that agreement meaningless and illusory by ignoring its provisions.  Despite this Court's admonition in *ADT II* that "[t]he settlement agreement and injunction clearly **require** Plaintiff to follow a dispute resolution procedure **if Plaintiff believes that the Court's injunction has been violated**" (ADT II 438 at 9-10; emphasis in original), Plaintiffs contemptuously have characterized the request that this court-ordered dispute resolution procedures be followed as an attempt "to frustrate ADT's efforts to prosecute its case

and bring an end to Alder's unlawful conduct." (June 11, 2018, email from Chip Sander to Jennifer Nicole). Such blatant disregard of the Court's mandate and the parties' Settlement Agreement constitutes knowing and willful misconduct by Plaintiffs. The Court should exercise its broad equitable discretion to refuse aid to Plaintiffs, who have come to the Court tainted with inequitableness or bad faith relative to the matter in which Plaintiffs now seek relief, however improper may have been the *alleged* behavior of the Defendant. *See generally*, *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814-15 (1945).

**Nineteenth Affirmative Defense (All Counts)**

The Second Amended Complaint fails to state a cause of action upon which relief can be granted against the Alarm Protection State Entities. As Paragraphs 23 through 25 of the Second Amended Complaint allege, the operations of the Alarm Protection State Entities, including functions relating to the sales business and agents and the collection and disbursement of alarm account payments, transferred to Alder Holdings, LLC prior to 2016 and, since then, Alder Holdings, LLC has been the entity that sells and manages alarm accounts.

*DEFENDANTS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.*

## COUNTERCLAIM

Counterclaim-Plaintiff/Defendant Alder Holdings, LLC, through its undersigned counsel, sues Counterclaim-Defendant/Plaintiff ADT, LLC and states:

1. This is a claim for civil contempt of the October 20, 2017, Permanent Injunction, tortious interference with Alder's business relations, and common law unfair competition.

2. Counterclaim-Plaintiff Alder Holdings, LLC ("Alder") is a Utah limited liability company that is in the business of selling residential alarm systems in various parts of the United States, including, but not limited to Florida.

3.  Plaintiff ADT, LLC ("ADT") is a Delaware limited Liability Company that has its principal place of business in Boca Raton, Palm Beach County, Florida.  ADT also sells, both directly and through dealers, residential alarm systems throughout the United States.

4.  This Court has jurisdiction over this action pursuant to 28 USC § 1367 because each shares some "common nucleus of operative fact" with the claims in ADT's Second Amended Complaint, over which the court has original jurisdiction pursuant to 28 U.S.C. § 1331.

5.  Venue is appropriate in the Southern District of Florida because ADT resides in and is otherwise found in this District and because a substantial number of the events giving rise to the claims asserted in this Complaint occurred in this District.

### ADT's Violations of The Injunction

6.  *ADT LLC v. Alarm Protection LLC,* No. 9:15-cv-80073 ("*ADT II*"), was settled on May 24, 2017 by the parties.

7.  As part of the May 24, 2017, Settlement Agreement in *ADT II*, which the parties agreed to in open court at a Settlement Conference before Judge Hopkins, the parties committed to a dispute resolution process prior to litigation that required ADT to produce documents and recordings and to discuss the alleged complaints of particular customers prior to litigating over those complaints:

> And, then, the second part of the agreement, the next essential term, is if ADT believes there has been a violation of the injunction, the parties have agreed to a dispute resolution process that has to be followed prior to filing a motion for contempt with the Court, which includes, just generally speaking, written notice and production of the recordings and other facts relating to the alleged violations.  And a timeframe of 14 days to resolve the dispute.  If it is not done it will go to mediation within 45 days and if it's not resolved in mediation, then, ADT may seek appropriate relief with the Court.

(ADT II DE 438 at 2; DE 414 at 4-6).

8. The parties further agreed to entry of a Permanent Injunction, which became effective on May 24, 2017.  The Permanent Injunction further mandates that ADT follow an agreed dispute resolution process for customer complaints *prior to* filing any contempt claim or other proceeding with the court based on those particular complaints.

9. Specifically, the Injunction entered as part of the resolution of *ADT II* says:

> **ORDERED AND ADJUDGED** that in the event ADT believes that the Enjoined Parties have violated the injunction, the parties will engage in the following dispute resolution process before ADT files any motion for contempt or any motion to enforce the injunction:
> a. ADT will provide written notice to the Enjoined Parties, through their Legal Department, or any other such individual that the Enjoined Parties shall designate, of the alleged violation and the facts and all recordings in their entirety supporting such violation;
> b. The parties will work together in good faith to bring a prompt resolution of the dispute concerning the alleged violation;
> c. If the dispute is not resolved within 14 days after receipt by the Enjoined Parties of written notice of the alleged violation, the Parties will mediate the dispute, with mediation to be completed within 45 days after receipt by the Enjoined Parties of written notice of the alleged violation;
> d. If the dispute is not resolved after mediation during the specified period, ADT may seek any appropriate relief with the court. In the event any of the Enjoined Parties is found to have violated this injunction, ADT shall be awarded its attorney fees and other costs of litigation that ADT incurs in any action to enforce this injunction, in addition to all other remedies and damages available. Additionally, in the event any party is required to enforce the terms of the Final Settlement Agreement, the party enforcing the terms of the Final Settlement Agreement shall be awarded attorneys' fees and other costs if successful.

10. This Court has held that the alternative dispute resolution requirements in the Injunction *must* be met before ADT can bring claims against Alder.  *See* Order (DE 31).  To be sure, on January 11, 2018, the Court rejected ADT's position that ADT "has the unilateral right to completely ignore the terms of the injunction and the terms of the parties' settlement agreement," and held that "[t]he settlement agreement and injunction clearly **require** Plaintiff to follow a dispute resolution procedure **if Plaintiff believes that the Court's**

**injunction has been violated**.” (*ADT II* 438 at 9-10; emphasis in original). The Court held that “[t]he injunction clearly and unambiguously requires Plaintiff to pursue its remedies for a violation of the injunction through certain defined procedures – any other interpretation of the injunction renders Plaintiffs’ agreement to this provision meaningless and illusory.” (*ADT II* 438 at 10; citing the dispute resolution procedures). The Court ruled that “[i]f any party before the Court were to act against the terms they agreed to be bound to at the settlement conference, such an action would result in unfair prejudice against the opposing party, would harm the integrity of the judicial process and would equate to the improper use of judicial machinery.” (*ADT II* DE 437 at 8).

11. The purpose of the dispute resolution process was to provide a mechanism for the parties to resolve their disputes meaningfully without the need for further litigation that would embroil customers in disputes between two companies.

12. The inclusion of the dispute resolution process in the Permanent Injunction is a material reason that Alder agreed to enter into the May 24, 2017, Settlement Agreement in *ADT II*. Alder relied on ADT’s representations, by entering into the May 24, 2017, Settlement Agreement.

13. ADT, however, essentially has ignored the dispute resolution requirements. Although the Court forced ADT to participate in the dispute resolution process in January 2018, ADT’s conduct since that Order establishes that ADT still has no intention of discussing specific customer issues meaningfully to determine whether or not there really was a legitimate complaint or not, whether it was a violation of the Permanent Injunction, or whether there really were any actual damages to ADT.

14. These are real issues that need careful attention.  Alder takes many steps to ensure that its customers were not confused as to its affiliation with any other company.  For example, as part of the contract, Alder customers must sign an Affirmation of Understanding, which confirms that (a) the sales representative wore his Alder clothing and introduced himself as being with Alder; (b) that the customer understands that Alder has no relationship or association with the customer's prior provider (i.e. ADT); and (c) that the prior provider (i.e. ADT) is still in business and still capable of monitoring that customer's alarm.  These same confirmations are required to be completed via either a telephone call between the customer and a representative at Alder's headquarters, or via an interactive video conference.  For the customers that are at issue in this lawsuit who entered into a contract with Alder, these same processes were followed.

15. Incredibly, ADT stubbornly has refused to even provide "all facts and all recording in their entirety" to the management of Alder so that they can review the materials in conjunction with interviews of the sales representative who is alleged of a violation. ADT instead has marked all information "attorney's eyes only."  Naturally, Alder cannot meaningfully investigate and discuss the customer complaints with ADT without "all facts and recordings in their entirety supporting such violations," as referenced in the Permanent Injunction.  Likewise, Alder cannot meaningfully discuss and investigate the matters when Alder cannot share the information "in their entirety" with Alder sales representatives or customers.  There is no mention whatsoever in the May 24, 2017, Settlement Agreement of the information being provided only to attorneys, and such a restriction precludes the parties from having the required "good faith" dispute resolution

process by discussing the complaints with the sales representatives and customers at issue.

16. Furthermore, Alder cannot meaningfully resolve particular customers' complaints when ADT's outside litigation attorneys are contacting those customers to elicit sworn testimony against Alder **before** ADT even provides Alder with a written notice of violation with respect to those customers. For instance, Beatrice Joseph testified under oath that she was contacted by ADT outside counsel on May 14, 2018, to elicit her sworn testimony and to schedule her deposition at the same time she was trying to resolve her issues with her vendor, Alder. (Joseph Dep. Tr. 97:3-98:5). This *ex parte* communication between ADT's outside litigation counsel and Alder's customer, Ms. Joseph, occurred **prior to** ADT serving a written notice of violation with respect to Ms. Joseph on May 22, 2017, and constitutes a breach of the May 24, 2017, Settlement Agreement and a violation of the October 20, 2017, Permanent Injunction.

17. Moreover, although ADT finally sent a "Second Amended Notice of Violation" on May 22, 2018, ADT has thus far failed to provide the required documentation for all of the customers named in the Second Amended Notice of Violation. Thus, the initial 14 day period has not yet begun to run and the alternative dispute resolution process has not been completed for the customers identified in the Second Amended Notice of Violation ("Second Notice Customers") and mediation has not yet occurred. ADT, in fact, admits in its Second Amended Complaint that this process is not completed.

18. Despite its knowledge that it has not completed the dispute resolution process, ADT, in complete disregard of the Permanent Injunction, continued to insert these customers into litigation, prior to engaging in the dispute resolution process, as follows:

a. ADT attached a spreadsheet identifying the Second Notice Customers to its recently filed Second Amended Complaint, suggesting that these Second Notice Customers should be part of this lawsuit.

b. ADT included certain Second Notice Customers in its Initial Disclosures.

c. ADT's representatives, including in-house legal staff and outside legal counsel, have called Second Notice Customers to discuss testimony, execution of declarations and appearing at depositions.  Alder is currently aware of at least six Second Notice Customers for whom this has occurred, but suspects there are more.

d. ADT has actually deposed one Second Notice Customer, and scheduled five others for deposition.

e. ADT has demanded that Alder participate in informal discovery for documents relating to these Second Notice Customers.

f. ADT has marked the documents that it is required to produce under the Permanent Injunction as "highly confidential – attorneys' eyes only" so that Alder itself is precluded from viewing these documents.

g. ADT representatives have directed customers to file complaints with Attorneys General, the Better Business Bureau, and the police department.

19. Thus, at the same time that Alder is attempting to comply with the Permanent Injunction, and to analyze ADT's allegations of a violation of the Injunction, and obtain information from the sales representatives and customers that may lead to resolution of the particular complaints, ADT is talking about the existing litigation to certain customers, and taking steps to further convince the customer that they should not stay with Alder.

20. ADT willfully has failed to comply with the dispute resolution process, in violation of the Permanent Injunction. Because ADT previously was mandated by the Court to follow the dispute resolution process, ADT's actions reveal a contemptuous disregard for the express terms of the Permanent Injunction.

21. As such, Alder has been denied of the benefit of its bargain in the settlement of *ADT II*.

### ADT's Deceptive and Misleading Tactics

22. In addition to its failure to comply with the Permanent Injunction, ADT has continued to take other actions in its effort to interfere with Alder's customer base.

23. Since May 24, 2017[1], ADT, through its phone operators, sales representatives and attorneys, have made blatant and intentional misrepresentations to Alder's customers with the intention of misleading those customers and convincing them to cancel their contracts with Alder.

24. ADT's representatives are encouraged to use deceptive and unfair sales tactics when talking to customers who have switched from ADT to Alder's alarm services. ADT operators make derogatory and false comments about Alder to the customers, to convince them that Alder's sale to them was deceptive and that Alder is not a legitimate company. Some specific examples of this conduct include, but are not limited to:

   a. In June 2017, an ADT representative falsely told an Alder customer, Joe Gelich, that 60 month contracts such as those used by Alder are illegal and, as a result, Joe Gelich was tricked into switching his services from Alder to ADT.

---

[1] The settlement of *ADT II* included a mutual release of all claims prior to May 24, 2017, so that Alder's claims relating to ADT's interference and unfair competition only include claims that arose subsequent to May 24, 2017. (*ADT II*, DE 414 at 7-8).

b.  In July 2017, an ADT representative falsely told an Alder customer, Veronica Lenon, that 60 month contracts such as those used by Alder are not valid and, as a result, Veronica Lenon was tricked into switching her services from Alder to ADT.

c.  In July 2017, an ADT representative falsely told an Alder customer, Doretha Douglas, that 60 month contracts such as those used by Alder are not valid and, as a result, Doretha Douglas was tricked into switching her services from Alder to ADT.

d.  In July 2017, an ADT representative falsely told an Alder customer, Bobbie Jenkins, that she was getting an upgrade from her current alarm company, Alder, and, as a result, Bobbie Jenkins was tricked into switching her services from Alder to ADT.

e.  In September 2017, an ADT representative falsely told an Alder customer, Hurbert Hughes, that Alder's equipment was not protecting his home and, as a result, Hubert Hughes was tricked into switching his services from Alder to ADT.

f.  In October 2017, an ADT representative falsely told an Alder customer, Everett Hollar, that contracts for more than three years, such as the one used by Alder for 60 months, are illegal and, as a result, Everett Hollar was tricked into switching his services from Alder to ADT.

g.  In November 2017, an ADT representative falsely told an Alder customer, Ruby White, that Alder was not a legitimate company and that Alder was not licensed and, as a result, Ruby White was tricked into switching her services from Alder to ADT.

h.  In November 2017, an ADT representative falsely told an Alder customer, Jean Mosely, that the ADT representative would cancel her Alder contract for her and, as a result, Jean Mosely was tricked into switching her services from Alder to ADT.

i.  In February 2018, an ADT representative falsely told an Alder customer, Edith Jones, that he was just updating her system and changing her sign and, as a result, Edith Jones was tricked into switching her services from Alder to ADT.

j.  In March 2018, an ADT representative deceptively spent seven hours aggressively pushing an Alder customer, Ed Wesley, into switching services from Alder to ADT and, as a result, Ed Wesley was tricked into switching services to ADT.

k.  In April 2018, an ADT representative deceptively showed an Alder customer, Willie Harrison from Albany, Georgia, a video which said that Alder was not licensed in the State of Georgia and that Alder is not permitted to sell alarm systems in the State of Georgia and, as a result, Willie Harrison was tricked into switching services to ADT.

l.  In April 2018, an ADT representative falsely told an Alder customer, Kimberly Williams, that Alder is a scam company and, as a result, Kimberly Williams was tricked into switching services to ADT.

m.  In April, 2018, an ADT representative falsely told Sue Johnson, from Houston, Texas, that Alder's statements to Mrs. Johnson that her system needed an upgrade was not true.  When Mrs. Johnson asked the ADT representative whether her alarm system, which was installed in 2005 by Brinks (13 years ago), need an

upgrade, ADT falsely told her no, as part of ADT's deceptive efforts to convince Mrs. Johnson that she did not need the upgrade offered by Alder, which would have used technology 13 years more advanced.

n.   In July 2017, an ADT representative falsely told Ellen Smith that the Alder representatives may have actually cut her phone lines and advised Mrs. Smith to purposefully set off her alarm.

25. Since May 24, 2017, ADT has made these misrepresentations despite its knowledge that these customers were under contract with Alder for their alarm services at the time the misrepresentations were made.

26. Despite its knowledge that Alder's customers have a contractual relationship with Alder, ADT, though its phone operators, sales representatives, and attorneys, has specifically told Alder customers to cancel their contracts with Alder and/or stop payment on their checks for payments that the customers were required to make to Alder under their contracts with Alder.   Some specific examples of this conduct, include, but are not limited to:

a.   When Richard Beach told her that he had signed a contract with Alder, ADT's representative told him to call Alder and try to cancel his contract.  The ADT representative also told Mr. Beach that it was unprofessional for a company to sell door to door and that she does not know Alder well, but knows that they cannot provide the same quality as ADT.

b.   ADT's representative told Barbara Rose, that she needed to call Alder and cancel her contract and that she should call her bank and stop payment on her check to Alder, which was a payment Ms. Rose made pursuant to the terms of her contract

with Alder.  ADT's representative also told Ms. Rose that ADT would help her get Alder to cancel the contract if Mrs. Rose needed help canceling it.

c.   ADT's representative told Barbara Suitor's daughter that she or her mother needed to call and cancel Ms. Suitor's contract with Alder.

d.   ADT's representative told Blanche Jefferson to call and cancel her contract with Alder.

e.   ADT's representative told Gladys Denham to call and cancel her contract with Alder.

f.   Several ADT and/or Protection One representatives told Pelma Myers to call and cancel her contract with Alder.  As incentive for Ms. Myers to cancel her Alder contract, ADT's representative offered that ADT/Protection One would re-install her equipment and give her a lower monthly rate as well.

g.   ADT's representative tried to convince Terri Sollars to cancel her contract with Alder, telling her that otherwise she was putting her "trust and livelihood" in a company that was not accredited by the BBB. The representative offered her a lower rate and other incentives to leave Alder and come to ADT.

h.   ADT's representatives told Beatrice Joseph, to stop payment on her payment to Alder, which was made as a requirement of her contract with Alder.

i.   In July 2017, an ADT representative told Milton Hanks, that she did not know how trustworthy Alder was, since they did door to door sales and assured Mr. Hanks that ADT never did door to door sales.  The same ADT representative falsely told Mr. Hanks that the Alder representative may not even have provided his real name, deceptively questioned whether Alder was a legitimate company or

reputable and advised Mr. Hanks to call and get out of the contract with Alder as soon as possible.  The ADT representative also advised Mr. Hanks to stop payment on the check that he had given to Alder pursuant to his contract with Alder. ADT, through its representative, falsely told Mr. Hanks that any reputable company gave customers 60 or 90 days to terminate a contract and that ADT has a 90 day grace period on its contracts.[2]

27. To support its efforts to encourage termination of Alder customers' contracts with Alder, ADT has also called customers specifically to remind them of Alder's three day cancellation period and to encourage them to terminate their contracts with Alder.

28. ADT representatives make strong suggestions of deceptive conduct to all Alder customers, so that even customers who had no complaints about Alder's sales presentation are led to believe that they should have complaints.

29. For example, ADT's representative told Ellen Smith that Alder had committed a deceptive sale when Ms. Smith had made no mention of anything except the fact that she had changed services to Alder.

30. ADT representatives also direct customers to file complaints with Attorneys General, the Better Business Bureau, and the police department.

31. ADT is intentionally and recklessly taking such actions without any investigation or knowledge of what actually occurred during the sales presentations by Alder, or at any other time during the relationship between Alder and its customer(s).  ADT was not present during any of the Alder sales presentations, so cannot know whether or not the customer is relaying accurate and complete facts.  Often, the person ADT speaks to is not

---

[2] Contrary to its representative's statements to Mr. Hanks, ADT's own website says that it extends only the same three day cancellation period that Alder extends to its customers.

even the person who was at the sales presentation, and ADT is aware of that.  Yet, ADT blindly charges ahead with its campaign to discredit Alder and disrupt Alder's customer base.

32. ADT's deceptive practices have injured Alder by causing Alder's customers to listen to their misrepresentations and deceptive sales pitches and, ultimately, to uninstall their Alder alarm systems, replace them with ADT's equipment, terminate the customers' Alder contracts, and have the customers execute new contracts for security services with ADT.

33. ADT, by falsely representing to Alder customers that their alarm systems are not working, and by making other untrue and misleading statements about Alder, have damaged Alder's goodwill and reputation.

34. Alder has been required, in some instances, to send technicians to the customers' homes to reinstall the removed Alder equipment.  Other customers have switched to ADT and never returned to Alder, so that they were lost as customers to Alder.

35. Alder has been forced to retain the undersigned counsel in relation to these claims and is obligated to pay attorneys' fees and costs to them.

## COUNT I: CONTEMPT OF INJUNCTION

36. Alder incorporates its allegations in Paragraphs 1 through 35 as though fully set forth herein.

37. The October 20, 2017, Permanent Injunction entered as part of the resolution of *ADT II* requires the parties to complete a dispute resolution process *prior to* ADT pursuing any claims relating to particular customer complaints.

38. On January 11, 2018, the Court rejected ADT's position that ADT "has the unilateral right to completely ignore the terms of the injunction and the terms of the parties' settlement agreement," and held that "[t]he settlement agreement and injunction clearly **require** Plaintiff to follow a dispute resolution procedure **if Plaintiff believes that the Court's injunction has been violated**." (*ADT II* 438 at 9-10; emphasis in original). The Court held that "[t]he injunction clearly and unambiguously requires Plaintiff to pursue its remedies for a violation of the injunction through certain defined procedures – any other interpretation of the injunction renders Plaintiffs' agreement to this provision meaningless and illusory." (*ADT II* 438 at 10; citing the dispute resolution procedures).

39. ADT has failed to comply with the court-mandated dispute resolution process in the Permanent Injunction by contemptuously interjecting customers into the lawsuit *prior to* the initiation and conclusion of the dispute resolution process for those particular customers.

40. ADT's litigators and representatives have called customers to discuss their complaints and potential depositions with them before the alternative dispute resolution process has begun, much less been completed.

41. ADT also has refused to allow Alder to review "all facts and all recordings in their entirety" supporting their violations because ADT petulantly has marked this court mandated information "attorney's eyes only" despite no such limitation in the Permanent Injunction. ADT also has not provided any information for many customers listed in the notice of violations despite follow-up requests by Alder to do so.

42. The purpose of the dispute resolution process is to provide the parties a method to avoid litigation that involves their respective customers, yet ADT continues to insist on

litigation over negotiation.   In fact, Plaintiffs shockingly characterized Alder's simple request that the court-ordered dispute resolution procedures be followed as an attempt "to frustrate ADT's efforts to prosecute its case and bring an end to Alder's unlawful conduct."  (June 11, 2018, email from Chip Sander to Jennifer Nicole).  Even though this Court expressly reminded ADT that it had an obligation to comply with the dispute resolution process in  the Permanent Injunction on January 11, 2018 (*ADT II* DE 438), ADT mischaracterizes this court-mandate as bad faith by Alder.

43. Such willful blatant disregard of the Court's October 20, 2017, Permanent Injunction and the Court's January 11, 2018, Order constitutes knowing, willful and malicious misconduct by Plaintiffs.

44. Alder has been damaged by ADT's willful and knowing failure to comply with the Permanent Injunction.  For example, Alder has already paid $1 million, in order to obtain ADT's agreement to the dispute resolution process.  In addition, Alder is being denied its ability to attempt to resolve the disputes with these customers and ADT without litigation, which has resulted in customers cancelling their contracts with Alder at ADT's intentional behest.

45. Without sanctions to compel compliance, ADT will continue to disregard the injunction, undermining the May 24, 2017 Settlement Agreement of *ADT II*.

46. Alder is  entitled to attorney's fees for enforcement of the Permanent Injunction.

WHEREFORE, Alder respectfully requests that this Court enter judgment in favor of Alder and against ADT for damages, sanctions in the kind and amount as the Court finds necessary to coerce ADT's compliance with the Permanent Injunction, attorneys' fees, costs, and such other relief as this Court deems necessary and just.

## COUNT II: TORTIOUS INTERFERENCE WITH CONTRACT

47. Alder incorporates its allegations in Paragraphs 1 through 35 as though fully set forth herein.

48. Alder has binding and legal valid written contracts with its customers.  The contract includes multiple documents, including: (a) an Agreement for Monitoring and Installation of Security Systems; (b) the Affirmation of Understanding; and (c) the Schedule of Equipment and Services.

49. ADT is aware of Alder's contracts with its customers.  First, the customers are telling ADT that they are under contract with Alder. Second, as a result of the extensive litigation between the parties, ADT is aware that Alder has contracts with its customers.

50. ADT has intentionally and without justification interfered with Alder's contracts with certain of its customers, including, but not limited to, the examples set forth above in Paragraphs 24 and 25.

51. ADT has procured the breach of Alder's contracts with certain of its customers by its actions, which include, but are not limited to, having its operators, sales representatives and outside litigators interfere by discussing the litigation with Alder customers and involving Alder customers in litigation prior to completion of the dispute resolution process under the Permanent Injunction, advising Alder customers to terminate their contracts with Alder, making misrepresentations to the customers with the intention to have them terminate their contracts with Alder.

52. Alder has been damaged by ADT's intentional interference with Alder's contractual relationships. ADT's actions have confused the market for Alder's goods and services, disrupted Alder's relationships with its customers and caused Alder's customers to

withhold trade from Alder, damaged Alder's brand, goodwill and reputation, and unjustly enrich ADT at Alder's expense.

53. The willful and intentional nature of the torts described in this Complaint justifies an award of punitive damages in an amount sufficient to deter ADT from continuing to interfere with Alder's contractual relationships in the market for residential alarm security systems.

WHEREFORE, Alder respectfully requests entry of judgment in favor of Alder and against ADT for damages, punitive damages in a sum sufficient to deter ADT from engaging in further interference, costs, and all other relief this Court deems necessary and just.

## COUNT III: UNFAIR COMPETITION

54. Alder incorporates its allegations in Paragraphs 1 through 35 as though fully set forth herein.

55. ADT representatives make misrepresentations about Alder to Alder customers, and to convince Alder customers to terminate their contractual relationships and/or business relationships with Alder, as set forth herein.

56. ADT's efforts to mislead Alder customers are contrary to honest practices in industrial and commercial business.

57. ADT's misrepresentations and improper interference constitute frauds on the customers. ADT is aware of these actions and does nothing to stop them and, in fact, encourages such actions in an effort to gain business, particularly in light of ADT's high customer attrition rate, inability to compete with competitors that offer superior technology and service, and the rapidly declining stock value since ADT, Inc.'s Initial Public Offering on

January 23, 2018. ADT chooses to bully its competitors rather than to compete fairly in the marketplace.

58. Alder has been damaged by ADT's deceptive trade practices and unfair competition. ADT's actions have confused the market for Alder's goods and services, disrupted Alder's relationships with its customers and caused Alder's customers to withhold trade from Alder, damaged Alder's brand, goodwill and reputation, and unjustly enrich ADT at Alder's expense.

59. The willful and intentional nature of the torts described in this Complaint justifies an award of punitive damages in an amount sufficient to deter ADT from continuing to make misrepresentations in an effort to unfairly compete with Alder's contractual relationships in the market for residential alarm security systems.

WHEREFORE, Alder respectfully requests entry of judgment in favor of Alder and against ADT for damages, punitive damages in a sum sufficient to deter ADT from engaging in further deceptive and misleading acts, costs, and all other relief this Court deems necessary and just.

*ALDER HOLDINGS, LLC DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 14th day of June, 2018, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to:  C. Sanders McNew, Esq., 2385 NW Executive Center Drive, Suite 100, Boca Raton, FL 33431 (mcnew@mcnew.net) and Charles C. Eblen, Esq., Shook, Hardy & Bacon, L.L.P., 2555 Grand Blvd., Kansas City, Missouri 64108 (ceblen@shb.com).

GUNSTER, YOAKLEY & STEWART, P.A.
*Attorneys for Defendants*

450 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, FL  33301
Telephone:     954-462-2000
Facsimile:      954-523-1722

By: */s/ Michael W. Marcil*
      Michael W. Marcil, Esq.
      Florida Bar No.: 091723
      mmarcil@gunster.com
      Jennifer Nicole, Esq.
      Florida Bar No.: 00114578
      jnicole@gunster.com

FTL_ACTIVE 5132316.1