UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:17-CV-81237-ROSENBERG/REINHART

ADT LLC, *et al.*

    Plaintiffs,

v.

ALDER HOLDINGS, LLC, *et al.*,

    Defendants.
_____/

## ORDER ON POST-TRIAL MOTIONS

**THIS CAUSE** is before the Court upon Defendant Alder Holdings LLC's Renewed Motion for Judgment as a Matter of Law on Counts II and III and Renewed Motion for Judgment on Partial Rulings on Count I [DE 416], Alder's Motion for a New Trial and for Remittitur [DE 417], and Plaintiff ADT LLC's Motion to Amend Judgment [DE 420]. These Motions have been fully briefed. The Court has reviewed the Motions and the record and is otherwise fully advised in the premises.

In its Renewed Motion for Judgment [DE 416], Alder challenges ADT's entitlement to royalty and punitive damages. The Court previously addressed and denied Alder's Motions for Judgment on these two issues. *See* DE 383; DE 410 at 127-28; s*ee also ADT & ADT US Holdings, Inc. v. Alarm Prot. LLC*, No. 9:15-CV-80073, 2017 WL 2212541 (S.D. Fla. May 17, 2017). For the reasons previously stated on the record, Alder's Renewed Motion for Judgment [DE 416] is denied.

In its Motion to Amend Judgment [DE 420], ADT argues that there is manifest error because it lacked an opportunity to present evidence against Adam Schanz on the contempt claim and because the Court failed to make sufficient findings and conclusions as to the contempt claim when entering judgment in favor of Schanz. However, ADT stipulated before the trial that the contempt claim would be tried to the Court simultaneously with the claims tried to the jury. DE 341 at 5. ADT stated during the trial that it had introduced all of its evidence to support the contempt claim and that the record was complete. DE 410 at 199-200. The Court then granted Alder's Motion for Judgment in favor of Schanz, which had sought judgment "on all counts" and to which ADT had an opportunity to respond. DE 350; DE 351; DE 410 at 214-18. The Court determined, in part, that ADT had failed to put forth evidence of Schanz's actions during the relevant time period to support holding him directly liable. DE 410 at 216-17. ADT subsequently acknowledged that Schanz was no longer a defendant to this action. DE 366 at 2. Accordingly, the Court finds that there is no error that justifies amendment to the Judgment and ADT's Motion to Amend Judgment [DE 420] is denied.

Finally, the Court turns to Alder's Motion for New Trial and for Remittitur [DE 417]. In the Motion, Alder argues that it is entitled to a new trial based on numerous erroneous evidentiary rulings that affected its substantial rights and resulted in substantial injustice. The Court rejects Alder's challenges to the admissibility of the evidence for the reasons previously stated on the record. Moreover, where evidence was admitted for only limited purposes, the Court repeatedly gave the limiting instructions that Alder requested. *See Gowski v. Peake*, 682 F.3d 1299, 1315 (11th Cir. 2012) (stating that a jury is presumed to have followed its instructions).

Alder's request for remittitur, however, warrants additional discussion. On a motion for remittitur, the Court must decide the maximum award the evidence could support. *E.g., Frederick*

*v. Kirby Tankships, Inc.*, 205 F.3d 1277, 1284 (11th Cir. 2000). Alder argues that the evidence fails to support the jury's award of $3 million in compensatory damages and $1 million in punitive damages. There has been much discussion in this case (and in a prior case, *ADT LLC v. Alarm Protection LLC*, 15-CV-80073, "*ADT II*"), on the subject of a damages-modifier. In *ADT II*, ADT took the position that in order for it to be made whole it would have to multiply its known damages by a certain factor to account for its *unknown* damages. ADT's position was grounded in the well-known principle in marketing that not every customer complains about a negative experience. *ADT II*, DE 379 at 15. Thus, ADT reasoned that (1) it could identify a certain number of lost customers who switched to Alder, (2) it could assign a loss amount to each customer, and (3) ADT could multiply the resulting calculation with a modifier to account for customers it lost to Alder that ADT could not find or identity, perhaps because the customers never complained about Alder's sales practices. ADT's usage of a damages-multiplier was supported by expert testimony and the Court permitted ADT to proceed with its theory in both *ADT II* and the instant case. At no time, however, did the Court rule on what an appropriate damages-modifier would be or whether there was a limit on the modifier that ADT could request from the jury.[1] The Court addresses that topic now.

At trial, evidence was introduced that the actual amount of gross-revenue loss in this case (that ADT could prove) was in the vicinity of forty-six thousand dollars.[2] DE 409 at 200. Yet, at closing argument, ADT requested from the jury nine million dollars for lost revenue.[3] The gross

---

[1] The Court could not have ruled on a damages-modifier-limitation prior to the close of evidence. A request for remittitur is the better vehicle for the Court to evaluate ADT's damages-modifier theory as the Court can examine ADT's requested modifier in the light of the totality of the evidence at trial, including Alder's cross examination of ADT's experts.

[2] While ADT may dispute the specifics of the Court's computations, the Court's reasoning and conclusions are the same regardless of the precision employed in the mathematical computations contained herein.

[3] ADT argued that it had lost 149 accounts, that it valued those accounts at $2,400 per account, and that the known damages should be multiplied by 25. DE 411 at 54. 149 X $2,400 X 25 = $8,940,000.

revenue of Alder is sixty-six million dollars. DE 409 at 199. The forty-six thousand dollars in this case generated a damages demand equal to fourteen percent of Alder's *gross* revenue. While various factors, assumptions, and computations played into ADT's damages demand, the greatest factor was ADT's request to the jury to multiply its known damages by a factor of 25. DE 411 at 54. This factor, 25, was based upon ADT's contention that only four percent of its customers would complain about the willful, deceptive practices employed by Alder in this case ($1 \div 25 =$ 4%).[4] The Court turns its attention to ADT's expert testimony on this topic.

ADT's expert testimony (concluding that only four percent of customers would complain) was primarily based upon a study known as the TARP study. *E.g.,* DE 410 at 63. Two TARP studies were discussed at trial. The first TARP study (from 1976) analyzed how often consumers complain under a variety of different scenarios. For example, the study analyzed how often consumers complain when the dollar amount at issue is small and how often consumers complain when the dollar amount is large. *Id.* at 63-90. If a consumer lost at least fifty dollars, however, the complaint-rate in the study was **<u>eighty-eight percent</u>**, not four percent.[5] DE 410 at 64. On cross examination, ADT's primary expert on this matter (Mr. David Stewart), conceded that his proffered complaint-rate of four percent could not be found in the 1976 TARP study. DE 408 at 141-42.[6] Instead, Mr. Stewart stated that his four percent number came from a 1986 TARP study that looked at *how often complaints were reported to senior management in a company*:

> Q: And you mentioned tip of the iceberg in connection with this consumer complaint behavior. Now that we have more of a concept, how does that fit into the TARP studies and the literature on consumer complaint behavior, Dr. Stewart?

---

[4] By virtue of the jury's verdict in this case, Alder was found to have engaged in willful, deceptive sales practices through its salesmen.
[5] According to www.usinflationcalculator.com, $50 in 1976 would equal $225 in 2017.
[6] Q: And when I asked you at your deposition to point in the 1976 TARP study where that number comes from, you were unable to point me to that number? A: I was not.

4

> A: One of the most robust finding [sic] in the TARP studies over four decades and across multiple industries is that only **about 4 percent of complaints ever make their way to top management in an organization**. There may be some people who complain to frontline personnel, the retail salesclerk, the installer or the service provider, but those complaints frequently do not make their way up to senior management.

DE 408 at 92 (emphasis added). The evidence in this case was not limited to "complaints" that "ma[de] their way to top management." The evidence in this case was about all of the complaints and deceptive sales that ADT was able to locate through vigorous discovery. While Mr. Stewart cited a source other than the TARP study—a book—he conceded that his book citation contained no support for his proposition. *Id.* at 142.

Mr. Stewart's testimony suggested that his four percent number was more focused on ADT customers who had *any* encounter with an Alder salesman (which would not result in a loss of ADT revenue), rather than customers who were defrauded into entering into a contractual agreement with Alder (which would result in a loss of ADT revenue). *Id.* at 101 ("[I]t is highly unlikely that the vast majority of ADT customers who were called on by Alder ever actually complained."). Finally, Mr. Stewart conceded that in the present day it is far easier for a consumer to complain because, as compared to 1976 or 1986, a consumer can complain via e-mail, online chat, twitter, website, or text. DE 408 at 138.

Pursuant to the studies that ADT's own experts relied upon, the chances of a consumer complaining about negligible matters are very low. By way of example, "when you buy chewing gum you do not complain." DE 410 at 64. The essence of the TARP studies is that the chance of a consumer complaint is tied to the level of importance something has to the consumer. *E.g., id.* Thus, when ADT opines that the chances of one of its customers complaining is four percent, ADT's position, then, is that the level of importance its customers would assign to Alder's actions in this case is akin to the level of importance of a deficient pack of gum. No reasonable juror could

5

believe that—the contractual dollar amounts in this case[7] equate to roughly the cost of a wedding dress, a top-of-the-line computer, or a vacation getaway. Similarly, when ADT assigns a four percent complaint-rate to Alder's deceptive sales practices, ADT equates what a customer would feel, having been deceived into a multi-year contract containing termination penalties, with what a customer would feel when a pack of gum contains four sticks instead of five. No reasonable juror could believe that. Additionally, when ADT contends that its customers would be unable or unwilling to discover Alder's deceptive practices post-sale, resulting in the reduction of the complaint-rate to a mere four percent, no reasonable juror could believe that as well. First, the possibility that the customer would receive bills in the future from *both* ADT and Alder is high—both companies lock their customers into multi-year contracts with termination penalties and the arrival of two bills would alert the customer to the fraud.[10] Second, if the customer signed a contract with Alder the chances of ADT interacting with the customer at some point is also high and, at that point, the customer would realize Alder's prior deceptive sales practice. Third, many ADT customers testified that they were able to realize Alder's deceptive sales practice once the Alder agent left the home and they could review the Alder contract. Finally, ADT's reliance upon the probability of senior management being informed of a specific customer's complaint is almost entirely irrelevant—no reasonable juror could rely upon that metric to compute the damages-modifier in this case.

What multiplier, then, did the evidence reasonably support? One reasonable interpretation of the evidence is that the chances of a customer complaining ranges from eighty percent to ninety-

---

[7] By way of example, a sample Alder contract, Defendant's Exhibit 87, concerned 60 monthly payments at $49.99 per month for a total amount due of $2,999.40. A customer's early cancellation of the contract resulted in the customer's payment of "90% of the total remaining monthly charges."

[10] A common scenario discussed at trial was that an Alder agent would tell an ADT customer that ADT no longer provided services in the customer's area, and that Alder had been selected to assume the customer's security services.

6

five percent. *See* DE 408 at 132. Using those numbers, an appropriate multiplier would be 1.25 to 1.05, a far cry from ADT's demand for 25. Ultimately, however, the Court need not decide the maximum modifier that a reasonable juror could have awarded for the reasons set forth below.

The jury verdict form required the jury to list the total amount of compensatory damages:

> 5. If your answers are "Yes" for questions 2 **and/or** 4, what amount of compensatory damages, if any, is attributable to Defendant's conduct? If your answers are "No" to **both** questions 2 and 4, please go directly to question 8.

DE 380 at 3.[11] Here, ADT requested three different categories of compensatory damages: loss of revenue, loss of brand value, and loss of goodwill. DE 411 at 54-56. ADT requested nine million dollars for its lost revenue, but it also requested up to five million dollars for the loss of goodwill and an unspecified amount for the loss of its brand. *Id.* In the instant Motion seeking remittitur, Alder makes assumptions about the amount the jury awarded for loss of brand value and loss of goodwill. Alder makes its assumptions in order to speculate on what damages-modifier the jury awarded to ADT. DE 417 at 18. The Court cannot make assumptions on the jury's allocation, but even if it attempted to do so, the Court is required to view the verdict form in the light most favorable to ADT. *E.g., Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1265 (11th Cir. 2008). Viewed in such a light, the jury could have awarded a reasonable amount to ADT for loss of revenue, and then awarded the remainder of the three million dollars to loss of goodwill and loss of brand value. The jury's total award of three million dollars for loss of revenue, loss of brand value, and loss of goodwill is not so unreasonable as to warrant remittitur. Remittitur is only appropriate where the jury's award "is so excessive as to shock the conscience of the court." *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1447 (11th Cir. 1985). The jury's award of

---

[11] The parties' proposed verdict forms did not include a separate line for loss of revenue, so as to distinguish loss of revenue from other types of compensatory damages. The parties also never requested that the Court add a separate line on the verdict form for loss of revenue damages so that the Court could evaluate the modifier that the jury used in its loss of revenue calculation.

three million dollars for *all* compensatory damages and one million dollars in punitive damages does not shock the conscience of this Court, and the Court stands by its prior ruling[12] that this total amount of damages was a reasonable amount for the jury award. For these reasons, Alder's Motion for New Trial and for Remittitur [DE 417] is denied.

Based on the foregoing, it is **ORDERED AND ADJUDGED** that:

1. Defendant Alder Holdings LLC's Renewed Motion for Judgment as a Matter of Law on Counts II and III and Renewed Motion for Judgment on Partial Rulings on Count I [DE 416] is **DENIED**.

2. Defendants' Motion for a New Trial and for Remittitur [DE 417] is **DENIED**.

3. Plaintiff ADT's Motion to Amend Judgment [DE 420] is **DENIED**.

**DONE and ORDERED** in Chambers, West Palm Beach, Florida, this 11th day of September, 2019.

ROBIN L. ROSENBERG
UNITED STATES DISTRICT JUDGE

Copies furnished to Counsel of Record

---

[12] DE 392 at 2.